UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOCUST VALLEY WATER DISTRICT,<br><br>        Plaintiff,<br><br>    **-against-**<br><br>THE DOW CHEMICAL COMPANY,<br>FERRO CORPORATION, VULCAN<br>MATERIALS COMPANY,<br><br>        Defendants. | Case No. 19-cv-2490-NG-RLM<br><br>Hon. Nina Gershon |
| AND THESE RELATED CASES:<br><br>ALBERTSON WATER DISTRICT, CARLE<br>PLACE WATER DISTRICT, FRANKLIN<br>SQUARE WATER DISTRICT, GARDEN<br>CITY PARK WATER DISTRICT, WATER<br>AUTHORITY OF GREAT NECK NORTH,<br>GREENLAWN WATER DISTRICT, TOWN<br>OF HUNTINGTON & DIX HILLS WATER<br>DISTRICT, JERICHO WATER DISTRICT,<br>BOARD OF COMMISSIONERS OF<br>MANHASSET-LAKEVILLE WATER<br>DISTRICT, OYSTER BAY WATER<br>DISTRICT, PLAINVIEW WATER<br>DISTRICT, PORT WASHINGTON WATER<br>DISTRICT, ROSLYN WATER DISTRICT,<br>INCORPORATED VILLAGE OF GARDEN<br>CITY, INCORPORATED VILLAGE OF<br>HEMPSTEAD, INCORPORATED<br>VILLAGE OF MINEOLA, WEST<br>HEMPSTEAD WATER DISTRICT,<br>WESTBURY WATER & FIRE DISTRICT,<br>and WATER AUTHORITY OF WESTERN<br>NASSAU. | Case Nos. 18-cv-7282, 18-cv-7279, 19-<br>cv-2975, 18-cv-7277, 18-cv-7271, 19-<br>cv-3059, 19-cv-2986, 18-cv-7281, 19-<br>cv-85, 18-cv-7272, 19-cv-1351, 18-cv-<br>7266, 18-cv-7269, 19-cv-3197, 19-cv-<br>3570, 19-cv-2973, 18-cv-7278, 19-cv-<br>2990, 19-cv-2974 (all NG-RLM) |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**[1]

---

[1] This motion is being filed in *Suffolk County Water Authority*, Case No. 17-cv-6980-NG-RLM,
 pursuant to the Court's June 20, 2019 docket entries in the related cases.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 5

I.      Plaintiffs Do Not Plead Any Viable Causation Theory Under New York Law. ............... 5

      A.      The Complaints Fail To Allege Substantial Factor Causation ............................ 6

      B.      The Complaints Fail To Allege Market Share Liability. ....................................... 8

            1.      Plaintiffs' Allegations Confirm That Dioxane Is *Not* Incorporated In One Identical, Generically Marketed Product. ......................................... 10

            2.      Plaintiffs Fail To Define An Appropriate Market .................................... 14

            3.      Defendants Did Not Have Exclusive Control Over The Risk Of Their Product. ....................................................................................... 16

      C.      The Complaints Fail To Plead A Commingled Product Theory ......................... 17

      D.      The Complaints Fail To Plead Concurrent Cause Liability ................................ 20

CONCLUSION ................................................................................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*210 East 86th Street Corp. v. Combustion Eng'g, Inc.*,
    821 F. Supp. 125 (S.D.N.Y. 1993) ................................................................. *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................................6

*Bee v. Novartis Pharm. Corp.*,
    18 F. Supp. 3d 268 (E.D.N.Y. 2014) ...............................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................6, 7

*Brenner v. Am. Cyanamid Co.*,
    699 N.Y.S.2d 848 (N.Y. App. Div. 1999) .................................................. *passim*

*Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc.*,
    362 N.E.2d 968 (N.Y. 1977) ...........................................................................6

*Hamilton v. Beretta U.S.A. Corp.*,
    750 N.E.2d 1055 (N.Y. 2001) .................................................................... *passim*

*Hymowitz v. Eli Lilly & Co.*,
    539 N.E.2d 1069 (N.Y. 1989) .................................................................... *passim*

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
    175 F. Supp. 2d 593 (S.D.N.Y. 2001) ............................................................14

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005) .......................................................10, 20

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
    447 F. Supp. 2d 289 (S.D.N.Y. 2006) .......................................................18, 20

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
    591 F. Supp. 2d 259 (S.D.N.Y. 2008) ..............................................6, 7, 18, 19

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
    643 F. Supp. 2d 461 (S.D.N.Y. 2009) ............................................................19

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
    644 F. Supp. 2d 310 (S.D.N.Y. 2009) .......................................................18, 19

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
   725 F.3d 65 (2d Cir. 2013)..................................................................................18

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
   739 F. Supp. 2d 576 (S.D.N.Y. 2010).....................................................6, 7, 17, 18

*Matter of New York State Silicone Breast Implant Litig.*,
   631 N.Y.S.2d 491 (Sup. Ct. 1995)..............................................................9, 10, 11

*Pelman ex rel. Pelman v. McDonald's Corp.*,
   No. 02 CIV. 7821 (RWS), 2003 WL 22052778 (S.D.N.Y. Sept. 3, 2003),
   *vacated in part*, 396 F.3d 508 (2d Cir. 2005) ...........................................................8

*Phillips v. Sun Oil Co.*,
   121 N.E.2d 249 (N.Y. 1954)....................................................................................6

*Rojas v. City of New York*,
   617 N.Y.S.2d 302 (N.Y. App. Div. 1994) ...............................................................7

*Rosado-Acha v. Red Bull Gmbh*,
   No. 15-CV-7620 KPF, 2016 WL 3636672 (S.D.N.Y. June 29, 2016) .....................2

*S.F. v. Archer-Daniels-Midland Co.*,
   No. 13-CV-634S, 2014 WL 1600414 (W.D.N.Y. Apr. 21, 2014)................... *passim*

*Schneider v. Diallo*,
   788 N.Y.S.2d 366 (N.Y. App. Div. 2005) ...............................................................7

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008)....................................................................................2

*Suffolk Cty. Water Auth. v. Dow Chem. Co.*,
   No. 17-cv-6980 (E.D.N.Y. Nov. 30, 2017)..............................................................3

*Voss v. Black & Decker Mfg. Co.*,
   450 N.E.2d 204 (N.Y. 1983)....................................................................................6

**Other Authorities**

William L. Prosser,
   Law of Torts (4th ed. 1971) ....................................................................................7

## INTRODUCTION

The twenty complaints before the Court in this motion to dismiss represent an attempt by Long Island water districts and drinking water providers to selectively target three manufacturers of 1,4-dioxane ("dioxane") and products allegedly containing dioxane.[2]  Plaintiffs have brought this suit against these three Defendants alone, ignoring all other manufacturers and distributors of those products and ***companies that their counsel sued in the first of these coordinated cases***— companies who Plaintiffs alleged make dioxane-containing products used throughout Long Island. Having plucked three targets from the entire chain of commerce spanning decades of dioxane use, and having made no effort to determine the actual source of the dioxane in their water, Plaintiffs now seek to prospectively recover future costs that they might incur for treatment infrastructure for their wells.

On their face, these complaints do not adequately state a claim for relief against these three Defendants.  Plaintiffs have failed to allege any plausible theory of causation.  The mere presence of dioxane in unidentified wells is the extent of Plaintiffs' claims; the complaints do nothing to identify which wells have dioxane and at what levels, much less who actually disposed of the dioxane allegedly present in the groundwater.  Nor do the complaints identify how any Defendant—none of whom is alleged to have used or disposed of dioxane near any wells—is

---

[2]   The Plaintiffs in the twenty complaints at issue are Albertson Water District, Carle Place Water District, Franklin Square Water District, Garden City Park Water District, Water Authority of Great Neck North, Greenlawn Water District, Town of Huntington & Dix Hills Water District, Jericho Water District, Locust Valley Water District, Board of Commissioners of the Manhasset-Lakeville Water District, Oyster Bay Water District, Plainview Water District, Port Washington Water District, Roslyn Water District, Incorporated Village of Garden City, Incorporated Village of Hempstead, Incorporated Village of Mineola, West Hempstead Water District, Westbury Water & Fire District, and Water Authority of Western Nassau.  While this motion cites to the Locust Valley complaint throughout, the cited paragraphs are substantively identical in all twenty cases.

responsible for the dioxane in any well.  Plaintiffs try to sidestep their burden by alleging that it is simply impossible to identify the manufacturer or the product that led to the alleged dioxane contamination in each well or to otherwise identify its actual source.  As Plaintiffs' counsel recently told the Court, Plaintiffs' position is "that, as a practical matter, trying to unwind contamination from enumerable sources across the landscape is a ***scientific impossibility*** and, as a matter of litigation, ***impractical***."  Ex. A at 29:14-17 (emphasis added).  To justify their lack of a pre-filing investigation to determine the source of the dioxane on which they base their claims, Plaintiffs have suggested that, after discovery, they hope to fall back on one of three mutually exclusive alternative theories—namely: (i) market share liability; (ii) "commingled product" liability; or (iii) concurrent cause liability.  Pls.' Letter, 2, June 7, 2019, 18-cv-07282-NG-RLM Document 35.  But Plaintiffs have not actually pleaded any of those theories, nor have they pleaded facts that would make it remotely plausible to apply those exceptional and rarely-used theories to these cases.  The complaints should be dismissed.

## BACKGROUND

The following summary, taken as true solely for the purposes of this motion, relies on the factual allegations in the complaints.  The Court may also take judicial notice of court documents to establish that the information contained therein has been publicly asserted.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008).  These documents include the first complaint filed in this set of related cases and the transcript of the ruling on the motion to dismiss the first complaint, Plaintiffs' pre-motion letter, and the transcript from the pre-motion hearing.  *See Rosado-Acha v. Red Bull Gmbh*, No. 15-CV-7620 KPF, 2016 WL 3636672, at *7 (S.D.N.Y. June 29, 2016).

In 2017, Suffolk County Water Authority filed the first complaint in this litigation, naming the three Defendants here as well as a company who produces a leading detergent brand and its

primary supplier of surfactants, respectively. *Suffolk Cty. Water Auth. v. Dow Chem. Co.* ("SCWA"), No. 17-cv-6980 (E.D.N.Y. Nov. 30, 2017); *see* SCWA Compl. ¶¶ 11, 13, 15. In a telephonic status conference on December 13, 2018, Judge Bianco orally denied a motion to dismiss filed by the defendants in that action. Ex. B at 3:12-15. No written opinion was issued. At the June 19, 2019 status conference, this Court confirmed that Defendants are entitled to proceed with a motion to dismiss all of the new complaints.[3] Ex. A at 37:2-4.

Plaintiffs are public water districts and drinking water providers in Nassau and Suffolk Counties. *See* Compl. ¶ 1. Plaintiffs supply drinking water to households and businesses "exclusively from municipal supply wells." *Id.* ¶¶ 1, 5, 42. Plaintiffs allege that dioxane has been detected in "varying amounts at varying times in the District[s'] wells." *Id.* ¶¶ 43, 54. The U.S. Environmental Protection Agency ("EPA") classifies dioxane as a likely human carcinogen. *Id.* ¶ 22.

Dioxane is an organic compound that appears as an "ingredient, component, contaminant, and/or impurity in certain industrial and commercial products." *Id.* ¶ 2. Dioxane "was most widely used in industrial settings as a stabilizer for chlorinated solvents," namely 1,1,1-trichloroethane ("TCA"). *Id.* ¶ 19. TCA, which has been banned domestically and internationally for over two decades because of climate concerns, was used to remove grease from machined metal products. *Id.* TCA has also been used as a septic tank and drain cleaner, among several other uses. *Id.* According to the complaints, unidentified users of chlorinated solvents, including TCA, "routinely disposed of waste solvents by pouring them onto the ground," or otherwise "applied, discharged,

---

[3]   There are twenty-four complaints involved in this litigation. The SCWA complaint has already been the subject of a motion to dismiss. Of the remaining three, the response to the New York American Water Company, Inc. complaint is due on August 23, and responses to the Bethpage Water District and South Farmingdale Water District actions have been adjourned because Plaintiffs' counsel represented that amended complaints will be filed.

disposed of, or . . . released [the solvents] onto land or water" near Plaintiffs' wells. *Id.* ¶¶ 36, 48, 61. Soil does not absorb dioxane; after discharge, dioxane "migrates through the subsurface and into groundwater." *Id.* ¶ 21.

In addition to its historic industrial uses, dioxane appears in numerous consumer products. Dioxane is a byproduct of the "production of ethoxylated surfactants and thus occurs as an impurity in certain consumer products." SCWA Compl. ¶ 14. For almost seventy years, these surfactants have been found in countless everyday products, including "detergents, soaps, laundry pre-soaps, cosmetics, shampoos, automotive antifreezes, aircraft de-icing fluids, foaming agents, emulsifiers, wetting agents, and other products." *Id.* These surfactants are used most often in the production of household and commercial laundry detergents. *Id.* ¶ 15. Commercial use of these products has led to the introduction of dioxane "into the wastewater stream" "as an impurity." *Id.* ¶ 37; *see also* Compl. ¶ 2. The inevitable failures of sewer lines, "which commonly lose some of the wastewater they carry," and septic tank leaking, lead to dioxane reaching the groundwater. SCWA Compl. ¶ 37; *see also* Compl. ¶ 37.

New York's State Department of Health currently regulates dioxane under a generic maximum contaminant level ("MCL") of fifty parts per billion ("ppb"). Compl. ¶ 27. "None of the District[s'] wells ha[ve] ever exceeded this generic standard," even though "discharges occurred at various locations, at various times, and in various amounts." *Id.* ¶¶ 27, 48. There is currently no enforceable federal or New York State drinking water quality standard that is specific to dioxane. *Id.* ¶ 26.

The complaints allege five causes of action: strict products liability for defective design (Count I); strict products liability for failure to warn (Count II); negligence (Count III); public

nuisance (Count IV); and trespass (Count V).  Each of Plaintiffs' claims hinges on the discharge of dioxane by unnamed third parties not before the Court.  *See* Compl. ¶¶ 34-38, 48, 61.

## ARGUMENT

### I.   Plaintiffs Do Not Plead Any Viable Causation Theory Under New York Law.

Causation is a threshold element required of each claim that Plaintiffs assert.  Unlike the SCWA complaint that was before Judge Bianco, these Plaintiffs allege that dioxane is "fungible" and that products containing dioxane "commingled" to the point that "it is impossible" to identify a source of the alleged contamination.  *See* Compl. ¶¶ 23, 24.  Because Plaintiffs admit that they cannot establish that any Defendant caused the alleged presence of dioxane in any well, the complaints fail to allege causation under New York law's traditional substantial factor analysis.

While it is the language of the complaint itself that controls a Rule 12 analysis, Plaintiffs have represented to the Court that (i) they "likely will not need an alternative method of proving causation" (Pls.' Letter, 3, June 7, 2019, 18-cv-07282-NG-RLM Document 35), and (ii) "as a matter of direct causation, [they] expect the testimony will be that [Defendants'] products are in every plume and have substantially contributed to . . . Plaintiffs' injuries . . . [They] will prove exactly whose product is in each well."  Ex. A at 30:4-6, 29:5-6.  Plaintiffs claim that they "added those [alternative theory] allegations here in support of a potential alternative causation motion." *Id.* at 29:3-4.  These statements contradict the express allegations of impossibility and ignore that no complaint plausibly alleges that any Defendant's dioxane "is in each well."

Their inconsistent representations aside, Plaintiffs have indicated that they intend to rely on one of three mutually exclusive fallback theories: market share liability, commingled product liability, or concurrent cause liability.  Plaintiffs have failed to plead facts that would allow any one of these theories to be applied here.

### A.    The Complaints Fail To Allege Substantial Factor Causation.

Under *Twombly*, Plaintiffs must include allegations of fact sufficient to make their claim for relief "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The claim must "possess enough heft to show that the pleader is entitled to relief," *id.* at 545, meaning the plaintiff must plead enough facts that a court could reasonably infer that a defendant is liable for the alleged misconduct. *Id.* at 566.  "A plaintiff armed with nothing more than conclusions" is not allowed to "unlock the doors of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Causation is a fundamental element of each claim that Plaintiffs assert. *See Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 209 (N.Y. 1983) (defective design); *Bee v. Novartis Pharm. Corp.*, 18 F. Supp. 3d 268, 283 (E.D.N.Y. 2014) (failure to warn); *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1066 (N.Y. 2001) (negligence); *Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc.*, 362 N.E.2d 968, 972 (N.Y. 1977) (public nuisance); *Phillips v. Sun Oil Co.*, 121 N.E.2d 249, 251 (N.Y. 1954) (trespass).  "Tort liability usually depends on proof that a defendant's conduct was both the factual cause and the proximate cause of a plaintiff's injury." *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 591 F. Supp. 2d 259, 266 (S.D.N.Y. 2008); *see also In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 739 F. Supp. 2d 576, 597 (S.D.N.Y. 2010).

To withstand a motion to dismiss, Plaintiffs must identify the "exact defendant whose product injured the plaintiff." *Brenner v. Am. Cyanamid Co.*, 699 N.Y.S.2d 848, 850 (N.Y. App. Div. 1999); *see also S.F. v. Archer-Daniels-Midland Co.*, No. 13-CV-634S, 2014 WL 1600414, at *3 (W.D.N.Y. Apr. 21, 2014) ("To state any of these claims, a plaintiff must plausibly plead that her injury was a result, was a proximate cause, of the defendant's conduct."); *MTBE*, 739 F. Supp. 2d at 597 ("New York generally requires identification of the exact defendant whose product

injured the plaintiff.") (internal citation omitted); *MTBE*, 591 F. Supp. 2d at 266-67 ("it must be reasonably probable that it was defendant's product that caused the injury"); *210 East 86th Street Corp. v. Combustion Eng'g, Inc.*, 821 F. Supp. 125, 142 (S.D.N.Y. 1993) ("Under New York law, a plaintiff has the burden of proving that the product at issue is that of the defendant."). The "mere possibility of causation is not enough." *S.F.*, 2014 WL 1600414, at *4; William L. Prosser, Law of Torts § 41 (4th ed. 1971); *see also Twombly*, 550 U.S. at 577-78.

Identifying the product that caused Plaintiffs' alleged injury is a threshold requirement. Plaintiffs only meet the burden of their *prima facie* case if they establish, by a preponderance of the evidence, that a Defendant's act or omission was a "substantial" factor in bringing about the alleged injury. *E.g.*, *MTBE*, 591 F. Supp. 2d at 266 ("[P]laintiffs must show that it is more likely than not that the defendant's actions caused their injury."); *Schneider v. Diallo*, 788 N.Y.S.2d 366, 367 (N.Y. App. Div. 2005). Substantial means that the act or omission "had such an effect in producing the injury that reasonable people would regard it as a cause of the injury." *Rojas v. City of New York*, 617 N.Y.S.2d 302, 305 (N.Y. App. Div. 1994) (internal quotation marks omitted).

Plaintiffs have not alleged facts that plausibly establish any Defendant as a substantial factor in their alleged injuries. Plaintiffs merely allege that the improper disposal practices of unidentified third parties—whose existence and actions Plaintiffs can only speculate about— caused Defendants' dioxane or dioxane-containing products to contaminate their wells. Compl. ¶¶ 44, 48. Plaintiffs further allege that the physical characteristics of dioxane make it a "fungible" product, meaning they ***cannot*** attribute the dioxane in any well to any manufacturer or distributor. *Id.* ¶ 23. Indeed, in Plaintiffs' view, "using currently accepted scientific methods, ***it is impossible***, based on the chemical's physical characteristics, to identify the manufacturer of the 1,4-dioxane or the product containing the 1,4-dioxane." *Id.* ¶ 23 (emphasis added); *see also id.* ¶ 24

7

("1,4-dioxane lacks characteristics or a chemical signature that would enable identification of the specific company that manufactured the product . . . .  Even when it is possible to identify a source . . . *it is impossible* . . . to identify what portions of commingled 1,4-dioxane was manufactured or supplied by any particular Defendant.") (emphasis added).  The most generous reading of the complaints is that Plaintiffs allege that dioxane is present in some of their wells, that the chemical *might be* from a product that a Defendant manufactured, and that Plaintiffs made no effort to determine the actual source of the dioxane on which they base their claims.

Plaintiffs' burden under New York law is to identify the "exact defendant whose product injured the plaintiff" on the face of its pleadings.  *See Brenner*, 699 N.Y.S.2d at 850.  And Plaintiffs must "isolate the particular effect" of the Defendants' products on each of their wells.  *See Pelman ex rel. Pelman v. McDonald's Corp.*, No. 02 CIV. 7821 (RWS), 2003 WL 22052778, at *12 (S.D.N.Y. Sept. 3, 2003), *vacated in part*, 396 F.3d 508 (2d Cir. 2005).  Plaintiffs have not done so, and as a result have failed to allege substantial factor causation.

### B.    The Complaints Fail To Allege Market Share Liability.

In response to Defendants' pre-motion letter, Plaintiffs asserted that the complaints state a claim under the market share liability theory.  Pls.' Letter, 2, June 7, 2019, 18-cv-07282-NG-RLM Document 35.   "Market share liability provides an exception to the general rule that in common-law negligence actions, a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury." *Hamilton*, 750 N.E.2d at 1066.  When market share liability is applied, a defendant may be presumed severally, but not jointly, liable in an amount equivalent to its share of the relevant product market.  *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1078 (1989).[4]

---

[4]    Defendants' liability is several because not all participants in the market are before the court under traditional market share liability.  *Hymowitz*, 539 N.E.2d at 1078.

Market share liability is a rare exception to the ordinary rules of causation. Because market share liability allows plaintiffs to presume the key element of a products liability claim, the theory is a "departure[] from well-settled tort law," is "sparingly adopted" and used only "in extremely limited circumstances." *Matter of New York State Silicone Breast Implant Litig.*, 631 N.Y.S.2d 491, 492-93 (Sup. Ct. 1995); *see also Brenner*, 699 N.Y.S.2d at 851 (describing market share liability as a "seldom used exception" and rejecting its application in silicone breast implant litigation). In fact, New York's highest court has "refused to recognize [market share liability] in any other context besides [the originating case of] DES." *S.F.*, 2014 WL 1600414, at *5 (internal citations omitted).

"*Hymowitz* is the only Court of Appeals case to apply market-share liability, and the facts of that case are unique." *S.F.*, 2014 WL 1600414, at *3. The *Hymowitz* court cautioned that the challenges presented by DES culminated in "a singular case" that, combined with other situationally-specific factors, required divergence from traditional tort law principles. Few other cases merit the same result. As the New York Court of Appeals explained in *Hamilton v. Beretta* when it refused to apply market share liability to handgun manufacturers whose products were found in the illegal handgun market:

> Market share liability was necessary in *Hymowitz* because DES was a fungible product and identification of the actual manufacturer that caused the injury to a particular plaintiff was impossible. The Court carefully noted that the DES situation was unique. Key to our decision were the facts that (1) the manufacturers acted in a parallel manner to produce an identical, generically marketed product; (2) the manifestations of injury were far removed from the time of ingestion of the product; and (3) the legislature made a clear policy decision to revive these time-barred DES claims . . . .
>
> *                *                *                *
>
> In *Hymowitz*, each manufacturer engaged in tortious conduct parallel to that of all other manufacturers, creating the same risk to the public at large by manufacturing the same defective product. Market share was an accurate reflection of the risk they posed . . . . [A] manufacturer's share of the national handgun market does not

> necessarily correspond to the amount of risk created by its alleged tortious conduct.
> No case has applied the market share theory of liability to such varied conduct and
> wisely so.

750 N.E.2d at 1066-67. Just as in *Hamilton*, Plaintiffs' allegations do not merit the extraordinary

treatment of market share liability.

New York courts have identified several factors that bear on whether market share liability

may be extended to a new case. Courts look for (1) an "identical, generically marketed product;"

(2) a long latency period before harm; (3) a clear legislative policy decision about the importance

of the claims; (4) the ability to define an appropriate national market, including a narrow time

period for that market; (5) defendants with exclusive control over any risk produced by the

product; and (6) a signature injury. *See*, *e.g.*, *Hymowitz*, 539 N.E.2d at 1075; *Brenner*, 699

N.Y.S.2d at 852-53; *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 379 F.

Supp. 2d 348, 376 (S.D.N.Y. 2005). The claimed "[i]nability to locate evidence . . . does not alone

justify the extraordinary step of applying market share liability." *Hamilton*, 750 N.E.2d at 1067.

Whether market share liability may be used as alternative proof of causation is properly

raised on a motion to dismiss. *See S.F.*, 2014 WL 1600414, at *6 (dismissing the complaint for,

*inter alia*, failing to plead the particular brands of high fructose corn syrup products that allegedly

caused plaintiff's harm). Plaintiffs have failed to plead facts that would permit the extension of

market share liability to these dioxane cases.

## 1.  Plaintiffs' Allegations Confirm That Dioxane Is *Not* Incorporated In One Identical, Generically Marketed Product.

One of the key factors that supports the application of market share liability is the

production and distribution of an "identical, generically marketed product." *Hymowitz*, 539

N.E.2d at 1075; *see also Silicone Breast Implant Litig.*, 631 N.Y.S.2d at 493. ("[market share

liability's] application has been largely rejected by the courts primarily on the ground that the

product in question was not fungible."); *Hamilton*, 750 N.E.2d at 1067 (rejecting application of market share liability where plaintiffs "never asserted that the manufacturers' marketing techniques were uniform" and defendants "engaged in widely-varied conduct creating varied risks").[5] Plaintiffs' failure to allege with any specificity that Defendants acted in a parallel manner to produce an identical, generically marketed product makes market share liability unavailable here.

Instead, Plaintiffs merely allege that dioxane "is fungible," in the sense that it is "chemically identical," no matter where the dioxane came from.  Compl. ¶ 23.  Even if the Court were to accept this assertion as true, the chemical composition of dioxane is irrelevant to whether the dioxane-containing ***products*** that led to the alleged contamination are fungible.  As in *Hymowitz*, Plaintiffs must establish that the product at issue is fungible.  *Hymowitz*, 539 N.E.2d at 1075 (analyzing not only identical chemical composition of DES, but also how "manufacturers act[ed] in a parallel manner to produce an identical, generically marketed ***product***") (emphasis added); *see also Brenner*, 699 N.Y.S.2d at 853 (analyzing the fungibility of lead paint rather than the raw material, white lead carbonate).

It is plain on the face of the complaints (and from common sense) that the dioxane-containing products used on Long Island were not fungible.  Put simply, industrial solvents on the one hand, and shampoos, laundry detergents, and other common household products on the other are hardly fungible or identical and generically marketed.  The complaints themselves confirm that dioxane is not manufactured, sold, or used in a uniform manner.

---

[5]   The phrase "identical, generically marketed product" used in *Hymowitz* has frequently been referred to by other courts as "fungible."

Plaintiffs' pleadings are a far cry from the singular and indistinguishable product that pharmaceutical companies produced and generically marketed in a parallel manner in *Hymowitz*. The *Hymowitz* court had to address the challenge of identifying the manufacturers of DES, a drug that had an identical chemical composition and an interchangeable supply in pharmacies. 539 N.E.2d at 1072. Although the litigation focused on DES as a pregnancy drug, pharmaceutical companies used DES to treat a number of maladies. *Id.* Nevertheless, the court limited the application of market share liability to manufacturers that produced DES specifically for pregnancy use. *See id.* at 1078. The complaints here neither allege nor would permit any such limitation on the scope of the dioxane product market. Instead, Plaintiffs claim they were damaged by contamination from dioxane incorporated into TCA, septic tank cleaners, drain cleaners, and sundry other uses. Plaintiffs thus ask the Court here to do exactly what the *Hymowitz* court deemed "unfair" and impermissible: to impose liability on all manufacturers of dioxane for all purposes, regardless of which products created the harm. *See id.*

The rejection of market share liability as applied to asbestos in *Combustion Engineering* and lead-based paint in *Brenner* is instructive. *See Combustion Eng'g*, 821 F. Supp. 125; *Brenner*, 699 N.Y.S.2d 848. Market share liability has been rejected in all New York asbestos cases primarily because "asbestos is not a unitary product with identical content." *Combustion Eng'g*, 821 F. Supp. at 127. Asbestos, like dioxane, is one small component of many different types of products, including sprayed-on fireproofing, acoustical tile, floor tiles, pipe insulation, pipe covering, woven connecting material, air duct insulation, silicate insulation, and boiler insulation, among many other products. *See id.* at 134-35.

Similarly, the *Brenner* court found that lead-based paint is not a fungible product because different paints contain varying amounts of lead pigments. 699 N.Y.S.2d at 853. The *Brenner*

court went so far as to acknowledge that the challenged chemical, white lead carbonate, might have been used in identical proportions among manufacturers.  *Id.*  Nonetheless, the variance in type and amount of lead used in the paint made the ultimate "product that was used by consumers" not fungible.  *Id.*  The same reasoning would hold true here, as Plaintiffs freely concede that no single product containing dioxane allegedly contaminated their wells.  That Plaintiffs specifically identify a variety of different end products is enough to find that they have failed to plead fungibility as a factor.

Plaintiffs filed the twenty complaints at issue here between December 2018 and June 2019. These new complaints are materially different from the SCWA complaint because they do not name other potential sources of dioxane contamination, including companies that allegedly manufactured dioxane-containing consumer products used throughout Long Island.  It is telling that, in these new complaints, Plaintiffs, in a change of tactics, not facts, chose to omit the allegations in the SCWA complaint describing the widespread use of dioxane in commercial and consumer products.  That complaint, which was prepared and filed by the same counsel representing these Plaintiffs (and to which each Plaintiff claims its case is related), explained that dioxane is a "by-product" of certain compounds that "have been used widely since the 1950s in detergents, soaps, laundry pre-soaks, cosmetics, shampoos, automotive antifreezes, aircraft de-icing fluids, foaming agents, emulsifiers, wetting agents, and other products."  SCWA Compl. ¶ 14.  It went on to allege that "*[t]he most voluminous and widespread use* of surfactants containing 1,4-dioxane is in the form of household and commercial laundry detergents."  *Id.* at ¶ 15 (emphasis added).  Just as courts have refused to apply market share liability to asbestos due to the breadth of its uses and consequent variance in content, so too should the Court reject market share liability for dioxane.

## 2.    Plaintiffs Fail To Define An Appropriate Market.

Plaintiffs also do not define an appropriate market for dioxane to support the extraordinary leap from traditional causation to market share liability.  To successfully invoke the theory, "a plaintiff must be unable to identify any of the specific [parties] responsible for the harm and defendants representing a substantial share of the market for the product must be joined in the action."  *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*, 175 F. Supp. 2d 593, 619 (S.D.N.Y. 2001).  "[A]lternative liability rests on the notion that where there is a small number of possible wrongdoers, all of whom breached a duty to the plaintiff, the likelihood that any one of them injured the plaintiff is relatively high, so that forcing them to . . . be held liable, is not unfair."  *Hymowitz*, 539 N.E.2d at 1074.  That fairness diminishes as the defendant pool increases and the probability that any one defendant actually caused the injury decreases.  *Id.*

As *Hymowitz* teaches, the ability to define a specific market that created the injury-inducing product is critical to ensure that a defendant is not held liable for an injury for which it is only presumed responsible and may not have caused.  In *Hymowitz*, the market was initially proposed as the national market for DES.  *See id.* at 1078.  The court narrowed the market to include only manufacturers that marketed DES for pregnancy use.  *See Brenner*, 699 N.Y.S.2d at 852.

Plaintiffs' complaints are fundamentally incompatible with a narrowly-drawn market.  As discussed, Plaintiffs allege that ***many*** products, both industrial and consumer, contain dioxane and were used on Long Island.  Yet Plaintiffs have chosen to sue only three companies associated with industrial dioxane-containing products; they name ***none*** of the companies associated with the consumer market for those products and ***none*** of the Long Island companies that actually use those industrial and commercial products.  Nor have Plaintiffs identified, either by geography or product type, the specific market to which liability would apply.  Defendants Dow and Ferro are identified simply as dioxane manufacturers, whereas Vulcan is identified as a producer of dioxane-stabilized

TCA.  Compl. ¶¶ 18, 20.  This alone presents two separate markets: one for dioxane as a raw material and one for dioxane-stabilized TCA.  Indeed, given the varied uses and forms of dioxane products, as alleged by Plaintiffs, defining any relevant market necessary for the application of the market share theory is impracticable at best.  *See Combustion Eng'g*, 821 F. Supp. at 146 ("application of market share theory to asbestos is impracticable because of the difficulties of defining a relevant market for a product with such a wide variety of uses, forms and chemical compositions").

An appropriately narrow time frame in which to apply market share liability is also critical to the definition of a market.  *Brenner*, 699 N.Y.S.2d at 852-53.  In *Hymowitz*, the injured plaintiffs could deduce the relevant time frame for their claims because they knew when their mothers were pregnant and therefore when they would have been prescribed the DES.  *Id.*  Here, Plaintiffs have not alleged any facts that would temporally limit when dioxane-containing products were manufactured, when dioxane was allegedly released into the environment, or when it reached their wells.  Instead, Plaintiffs present a ***fifty-five year*** window in which to apply liability.  Compl. ¶ 19.  The court in *Brenner* found that a twenty-nine-year window was too long of a time period for any fair assessment of lead paint manufacturers' market shares.  *Brenner*, 699 N.Y.S.2d at 852-53.  The court reasoned that some defendants could have entered and exited the market over the course of those twenty-nine years, and it would have been unfair to assess liability against a manufacturer that was not in the market when the disputed lead paint was applied to the plaintiffs' home.  *Id.*  Likewise, Plaintiffs here acknowledge that the market changed over the course of the fifty-five-year window the complaints describe.  *See* Compl. ¶ 18.

Finally, in order to proceed on a market share theory, a "substantial share" of the relevant market must be joined as parties in the case.  *Combustion Eng'g,* 821 F. Supp. at 146.  These

complaints fail to do so because, despite lumping together manufacturers of dioxane and just one dioxane-containing product, they omit many *other* manufacturers, including some already alleged by Plaintiffs' counsel.  In the SCWA complaint, Plaintiffs' counsel described one defendant as "the market leader in the laundry detergent sector," and another defendant as the primary supplier of ethoxylated surfactants, as additional sources of dioxane.  SCWA Compl. ¶ 31.  But all of the new complaints at issue here fail to name these two companies as defendants.  Moreover, in some of the newly-filed complaints, Plaintiffs identify—but decline to sue—yet another culpable party: "[a] leading brand" of septic tank, cesspool, and drain cleaner called "Drainz."  Compl. ¶ 37. Drainz "was widely used on Long Island," and its manufacturer had operations in Suffolk County. *Id.*  Yet Drainz's manufacturer, Jancyn Manufacturing Corporation, is not named as a defendant in this action, despite well-publicized lawsuits and legislation surrounding its product.

It is an abuse of the market share theory to allow Plaintiffs to cherry-pick three defendants who might be related to just a portion of the varied, longstanding use and disposal of dioxane on Long Island, and to seek to hold them responsible for contamination caused by parties not before the Court—particularly when Plaintiffs admit they have no way of knowing whether the dioxane in their wells has anything to do with these three Defendants.  These complaints utterly fail to allege any market that would permit the extension of the market share liability doctrine.

### 3. Defendants Did Not Have Exclusive Control Over The Risk Of Their Product.

A third key factor that allowed the *Hymowitz* court to apply market share liability was the exclusive control that DES manufacturers had over the risk of their product.  DES remained the same "from the point of manufacture to the point of ingestion by the patient."  *Brenner*, 699 N.Y.S.2d at 853; *see also S.F.*, 2014 WL 1600414, at *6.  This case does not remotely resemble *Hymowitz* in that regard.  The complaints confirm that dioxane is present as "an ingredient,

component, contaminant, and/or impurity in certain industrial and commercial products." Compl.

¶ 2.  Plaintiffs do not, and cannot, allege that the three Defendants named in these complaints

controlled the manner in which dioxane was incorporated into varied end products (including the

amount of it that may have been used) by different companies making completely different

products at different times.

*      *      *

Market share liability is the rare exception to traditional tort causation rules because it

allows plaintiffs to shed the burden of proving an essential element of their claims.  In order to

make that extraordinary leap and shift the burden of proof to Defendants, Plaintiffs must

demonstrate that the presumption of liability is appropriate: the product must be identical and

generically marketed in parallel, the market must be narrowly defined, and the allegedly culpable

parties must have had exclusive control over the injury-causing product.  Plaintiffs here have

pleaded the exact opposite.

### C.      The Complaints Fail To Plead A Commingled Product Theory.

Plaintiffs have also asserted that they can proceed under a causation theory known as

commingling, which has never been applied in New York.  Pls.' Letter, 2, June 7, 2019, 18-cv-

07282-NG-RLM Document 35; *see also* Compl. ¶ 24.  Judge Scheindlin created the "commingled

product" theory specifically for the *MTBE* litigation.  *See MTBE*, 739 F. Supp. 2d at 598.  Under

this theory, "when a plaintiff can prove that certain gaseous or liquid products . . . of refiners and

manufacturers were present in a completely commingled or blended state at the time and place that

the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, each

17

refiner or manufacturer is deemed to have caused the harm." *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 644 F. Supp. 2d 310, 314 (S.D.N.Y. 2009).[6]

Market share liability and commingled product liability are two distinct theories that cannot be applied simultaneously. "[M]arket share liability may not apply to cases where the product is commingled into a joint product." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*, 447 F. Supp. 2d 289, 300 (S.D.N.Y. 2006). This prohibition is due, in part, to the *prima facie* elements of each theory. Market share liability imposes a presumption of causation, while the commingled product theory requires proof of causation. *See MTBE*, 644 F. Supp. 2d at 314. Defendants are not aware of any case in which the commingled product theory has actually been applied. It was not ultimately applied in *MTBE* because the plaintiffs there proved direct causation against Exxon. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*, 725 F.3d 65, 91 (2d Cir. 2013); *MTBE*, 739 F. Supp. 2d at 588.

Judge Scheindlin created the commingled product theory in recognition of the unique transportation and distribution practices of gasoline products in the United States. The gasoline distribution system "requires manufacturers to mix their products together for transportation in a common pipeline system. *Because gasoline is commingled*, it is impossible to identify with certainty the refiners of the gasoline released . . . ." *MTBE*, 591 F. Supp. 2d at 264 (emphasis added). Because the end user taking gasoline from the pipeline is not in fact taking any one manufacturer's product, the gasoline is a "joint product" of every party shown to have contributed to the mix. *Id.* at 269.[7]

---

[6] Under the commingled product theory, liability is several and damages should be apportioned by proof of a defendant's share of the relevant market at the time of the injury. *MTBE*, 447 F. Supp. 2d at 301.

[7] Judge Scheindlin devoted five pages of her opinion to describing the uniqueness of the gasoline refining, supply, storage, transportation, and distribution system as the basis for her creation

The complaints here do not allege any factual predicate remotely similar to that in *MTBE*. In a bit of sleight-of-hand, Plaintiffs conflate commingling of different products ***before*** contaminants are released into the environment by the end user—as Judge Scheindlin described the pipelines and storage facilities conveying gasoline—with commingling of contaminants in groundwater ***after*** they have been released at different locations by different end users of completely separate, unmingled end products. The complaints allege that dioxane was found in varied products (*e.g.*, TCA fluids and aerosol cans). But there is no allegation whatsoever that any of these products were commingled ***before*** dioxane was allegedly discharged into the groundwater. This fatal flaw forecloses the application of the commingled product theory. Judge Scheindlin made clear that the entire premise of the commingled product theory is that the products are "in a completely commingled or blended state ***at the time and place that the harm or risk of harm occurred.***" *MTBE*, 644 F. Supp. 2d at 314 (emphasis added). The allegation that dioxane becomes commingled in the environment ***after*** it is released does nothing to relieve Plaintiffs of their burden to allege causation. *See* Compl. ¶ 24 (alleging that "once released into the environment" dioxane from different sources becomes commingled).

The commingled product theory is inapplicable for another reason. The theory still requires the plaintiff to show that a defendant's product was actually in the commingled product that caused the injury. *See In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 643 F. Supp. 2d 461, 470 (S.D.N.Y. 2009). Put differently, "the 'conceptual basis' for the commingled theory is that defendants' products were ***actually present*** and *contributed to the injury*." *MTBE*, 644 F. Supp. 2d at 314 (internal citation omitted) (emphasis added). This

---

of the commingled product liability theory. *Id*. at 269-274. None of those factors are present here. Notably, Suffolk County Water Authority was a plaintiff in that action.

distinguishes the commingled product theory from market share liability; there is no presumption of causation that applies to the commingled product theory.  Of course, Plaintiffs here have already disavowed any ability to prove that any one of Defendant's products is present in their wells, alleging that "it is impossible . . . to identify what portions of commingled 1,4-dioxane was manufactured or supplied by any particular Defendant."  Compl. ¶ 24.

**D.    The Complaints Fail To Plead Concurrent Cause Liability.**

The final alternative causation theory Plaintiffs have referenced in correspondence—but not pleaded in their complaints—is concurrent cause liability.  *See* Pls.' Letter, 2, June 7, 2019, 18-cv-07282-NG-RLM Document 35.  Concurrent cause liability "applies where two or more tortfeasors' actions combine to produce an indivisible injury to a plaintiff."  *Combustion Eng'g*, 821 F. Supp. at 150.  Similar to the commingled product theory, concurrent cause liability is meant to relieve plaintiffs of the burden of establishing individual liability when more than one defendant caused the alleged harm.  *MTBE*, 379 F. Supp. 2d at 371-72.  To sufficiently plead concurrent cause liability, Plaintiffs must allege that (1) each Defendant contributed to causing (2) an indivisible injury and (3) it would not violate traditional notions of fairness and justice to hold all Defendants jointly and severally liable for that injury.  *MTBE*, 447 F. Supp. 2d at 299.

Plaintiffs do not even attempt to plead the first element.  As discussed, Plaintiffs have already admitted that it is impossible to establish that any one of the three Defendants is the source of dioxane in any well, as opposed to, for example, dioxane from other manufacturers or commercial or industrial dioxane-containing products, consumer products containing dioxane attributable to other companies, or dioxane from some other source that has no connection to any Defendant.  Plaintiffs, moreover, cannot allege that *each* of the three Defendants contributed to the presence of dioxane in a well, much less that these three Defendants *alone* did so.

## CONCLUSION

The complaints should be dismissed.


Dated: July 24, 2019

Respectfully submitted,


/s/ *Kevin T. Van Wart*

Stephen C. Dillard (*pro hac*)
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX  77010
Phone: (713) 651-5151
steve.dillard@nortonrosefulbright.com

Kevin T. Van Wart, P.C. (*pro hac*)
Nader R. Boulos, P.C. (*pro hac*)
Jonathan N. Adair (*pro hac*)
Carolyn J. Weltman (*pro hac*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Phone: (312) 862-2000
kevin.vanwart@kirkland.com
nader.boulos@kirkland.com
jonathan.adair@kirkland.com
carolyn.weltman@kirkland.com

Felice B. Galant
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019
Phone: (212) 318-3000
felice.galant@nortonrosefulbright.com

*Counsel for Legacy Vulcan, LLC, formerly known as Vulcan Materials Company*

Joel A. Blanchet
Andrew P. Devine
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Phone: (716) 847-8400
jblanchet@phillipslytle.com
adevine@phillipslytle.com

Robb W. Patryk
Faranak Sharon Tabatabai Asl
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004
Phone: (212) 837-6000
robb.patryk@hugheshubbard.com
fara.tabatabai@hugheshubbard.com

*Counsel for The Dow Chemical Company*

*Counsel for Ferro Corporation*