# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Nader R. Boulos, PC
To Call Writer Directly:
+1 312 862 2061
nboulos@kirkland.com

Facsimile:
+1 312 862 2200

February 1, 2021

**VIA ECF**

The Honorable Nina Gershon
United States District Judge
United States District Court
 for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

The Honorable Roanne L. Mann
United States Magistrate Judge
United States District Court
 for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *Suffolk County Water Authority v. The Dow Chemical Company, et al.*
No. 2:17-cv-6980-NG-RLM, and *Related Cases*

Dear Judge Gershon and Judge Mann:

      The Dow Chemical Company, Ferro Corporation, Legacy Vulcan, LLC, The Procter & Gamble Company and Shell Oil Company (**Defendants**) respectfully provide this submission in anticipation of the Case Management Conference set for February 9.

      Following the Court's January 22, 2021 Order, Defendants again conferred with Plaintiffs' counsel in an attempt to reach agreement, or at least narrow their disagreements, over case management issues. As the Court will recall from the last round of submissions, the key disagreement between the parties has been whether and to what extent Defendants will be permitted to take depositions in the 27 cases before further decisions about case management are made. Defendants contend that some discovery (short of the completion of full fact discovery) is necessary and appropriate. Plaintiffs have focused on "prioritizing" the Suffolk County Water Authority ("SCWA") case for discovery and trial. While discussions initially suggested some progress toward an agreed approach, those discussions broke down and have revealed that there is still a fundamental disagreement between the parties. Defendants are seeking a meaningful opportunity to take discovery to identify important, threshold, case-defining issues such as the third-party sources actually responsible for any contamination, product identification, and potential similarities among the types of issues impacting each well. Plaintiffs purport to use "prioritization"—a concept found nowhere in the Federal Rules of Civil Procedure or the Rules of this Court—as a euphemism for shutting down the effort to develop the very real differences

among the events in the cases that they filed that led to the alleged presence of 1,4-dioxane ("dioxane") in more than 500 separate wells for which they seek damages.

In the parties' early discussions, Plaintiffs indicated that they would *not* try to prevent depositions in the 26 non-SCWA cases before the Court would be asked to make prioritization decisions, so long as the SCWA case were also allowed to progress—which Defendants have never opposed. Unfortunately, when Defendants proposed a schedule for these depositions, with procedural safeguards to avoid duplicative discovery, Plaintiffs backtracked. Plaintiffs' counter-proposal, which we assume they will advance in today's simultaneous submissions, makes any meaningful discovery illusory and hamstrings the Court's ability to make informed case management decisions. In Plaintiffs' proposal, SCWA would be made *ex ante* the "prioritized" case, and Defendants would be forced to focus on that case exclusively in order to complete *all* discovery by November 2021. That deadline is patently unrealistic for full discovery in the SCWA case, which is by far the largest—and worse yet, Plaintiffs propose an aggregate deposition limit that would for all practical purposes foreclose Defendants from taking any depositions in the 26 other cases.

With respect, nothing about Plaintiffs' proposal makes sense. There is no reason for the Court to make decisions about whether and how to "prioritize" cases or structure issues for trial with no record before it. There is no reason to deny Defendants the opportunity to take discovery of the 27 Plaintiffs who have each brought multi-million dollar claims. There is no Federal or Local Rule that confers immunity from discovery in "related" cases. And there is no reason to treat SCWA's case differently from all the others by "prioritizing" it *today*, on a blind basis. Plaintiffs make much of the fact that SCWA filed its case first, but that has no substantive import: the only discovery in *all cases* has been document production and initial fact sheets (to which responses are still in progress).[1] *All* of the cases need initial fact discovery—including discovery to identify the actual polluters of each well, who may be added to the case as defendants—before case management decisions are made.

The size of the SCWA case also cuts against Plaintiffs' proposal to force it to the front of the line now. SCWA's case dwarfs the others in scope, with approximately 300 individual wells at issue—each with its own hydrogeology, local industrial activity, pollution source(s), and contamination and remediation history. As a matter of simple common sense, there is no way the entire SCWA case can be prepared for trial more efficiently than cases of other districts involving five or ten wells—at least not without bottlenecking the entire group of related cases. It may be

---

[1] Indeed, with 25 of the 27 Plaintiffs, including SCWA, represented by the same counsel, it is hard to see how the order of document production, which is largely controlled by counsel, could ever justify "prioritizing" one case over another.

that, on a fuller record, the most efficient approach will be to try other cases first or to structure dispositive briefing or trial to address wells with common issues—issues that cannot be fully identified until the record is more developed.

Defendants' proposal is a more efficient, logical, and orderly way to manage these cases. In short, Defendants propose the prompt completion of party document production by March 31, as already scheduled; an initial nine-month period of depositions or follow-up written discovery (which may obviate the need for some depositions); regular communications with the Court about the progress of this discovery to promptly resolve disputes if they arise; and submissions early next year, with the benefit of a record, on how best to prioritize any of the cases, wells, or issues for the completion of discovery, dispositive motions and trial.

The remainder of this submission discusses Defendants' proposal and its rationale in more detail, and addresses the flaws in Plaintiffs' premature prioritization approach. We look forward to discussing these issues with the Court during the February 9 conference.

**Specifics of Defendants' Proposal**

These 27 individual actions, brought by 27 different water districts, allege that Defendants are responsible for contamination in over 500 separate wells. According to Plaintiffs, each of the wells at issue represents a multi-million dollar damage claim. That means that even the nominally "smallest" of these cases involves a claim against Defendants for millions of dollars. None of these actions can be assumed to have second-class status, nor can any of the Plaintiffs avoid basic discovery obligations, based on the sequence in which counsel filed them.

The near-term question is how to identify the most efficient way for the Court to guide these actions toward resolution. It should not be controversial to suggest that decision is best made based on a factual record. The Plaintiff water districts are differently situated, and within any one district the wells at issue are differently situated; each well may have been contaminated by a different polluter—not the Defendants—at a different time, by different products, involving different product handling and disposal practices, subject to different laws, and after receiving different warnings. All of these facts, yet to be discovered, bear directly on how these cases should be positioned for trial.

Consistent with their rights under the Federal Rules, Defendants ask that they be given the opportunity to take a limited number of depositions in order to develop enough of a record about the 27 water districts and 500-plus wells to make informed decisions about priorities or groupings. This discovery will need to be done eventually regardless of the schedule, so nothing will be lost by proceeding as Defendants propose. Indeed, Plaintiffs' current proposal already contemplates fact discovery through the end of November 2021, so there is little difference in the overall timing.

The Honorable Nina Gershon
The Honorable Roanne L. Mann
February 1, 2021
Page 4

Defendants propose that the Court enter a case management order that incorporates the following schedule:

| DEFENDANTS' PROPOSED SCHEDULE | |
|---|---|
| **Event** | **Deadline** |
| Completion of party document discovery | March 31, 2021 [as currently ordered] |
| "Initial Deposition Period" in all cases, including depositions of parties and third parties | April 1, 2021 to January 7, 2022 |
| Joint Status Reports on the progress of discovery | June 30, 2021; September 30, 2021; January 14, 2022 |
| Deadline for motions to compel relating to party document discovery | May 31, 2021 |
| Deadline to file motions to compel relating to third-party document subpoenas | July 30, 2021 |
| Deadline to serve additional written discovery directed at case management issues | September 22, 2021 |
| Any case management proposals (including for prioritization) shall be presented to the Court. The Parties shall meet and confer in advance of any such submissions to seek agreement, if possible. | January 14, 2022 |

The core of Defendants' proposed approach is an Initial Deposition Period, allowing for depositions in *all* cases. The Initial Deposition Period would not be a full fact discovery cut-off for any of the cases; it is simply a period to allow fuller development of the record on issues that will inform case management. The parties can avoid duplicative or burdensome discovery by following some basic guidelines and limitations:

1. Unless there is some overriding reason for an exception, discovery taken in one case will be applicable to all cases.

2. The parties will coordinate before each deposition to ensure that, to the extent possible, party witnesses sit for only one deposition, there is no redundant questioning by different counsel, and questioning is completed as quickly as possible. A witness deposed during the Initial Deposition Period will only be re-deposed by agreement of the parties or leave of Court, and only on non-duplicative matters.

3. **Depositions of Defendants:** Plaintiffs collectively will be permitted to take up to ten depositions of each Defendant or its employees, including depositions pursuant to Fed. R. Civ. P. 30(b)(6).

4. **Depositions of Plaintiffs**: Defendants will be permitted to take up to five depositions of each Plaintiff other than SCWA or its employees (not including retained consultants), including depositions pursuant to Fed. R. Civ. P. 30(b)(6). Counsel for SCWA has agreed that this limit will not apply to depositions of SCWA.

5. **Depositions of Plaintiffs' Consultants:** Defendants may take depositions of up to five consultants retained by any Plaintiff with respect to the work performed for that Plaintiff. These depositions shall be noticed in the cases of the specific Plaintiffs whose wells the Defendants intend to question on, without prejudice to the right to seek later, non-duplicative discovery regarding work for other Plaintiffs by the same consultants.

6. **Third Party Depositions:** The parties may take third-party depositions during the Initial Deposition Period. Third-party depositions taken during this period shall be noticed in the cases of the specific Plaintiffs whose wells the Defendants intend to question on, without prejudice to the right to seek later, non-duplicative discovery, and shall be usable in all Related Cases.

7. **Other Discovery Methods:** The Parties may serve additional written discovery and may initiate discovery motion practice as necessary.

Depositions of Plaintiffs' employees and their consultants in each of the cases will be important to develop the record for case management purposes. Many of these consultants have knowledge that cuts broadly across the water districts and wells at issue. Some of the same environmental consultants have, over the course of decades, been involved in the study, investigation, and remediation of many of the 500-plus wells at issue in this case. This work was performed at different times, on wells that are geographically distant from one another, and are often owned and operated by different water districts. Their investigations involved different types

of contaminants introduced into the groundwater by different parties, at different times, and in different manners. Defendants do *not* propose that a full record be developed now for every well that every consultant worked on, in lengthy "unrestricted" or "omnibus" depositions. Instead, Defendants intend to take targeted discovery of consultants regarding specific investigation and remediation work on specific wells, all of which will inform the ultimate decision regarding the next phase of case management.

This proposal does not include a hard and fast rule regarding the length of depositions. If there is reason to believe that the baseline limits in the Federal Rules are insufficient for a specific deposition, the Parties should be able to identify and resolve those issues as they have many others. If for some reason that process fails to materialize, breaks down, or one-off disagreements arise, we will of course seek the Court's guidance.

### Defendants' Proposal Gives The Court An Informed Basis To Make Case Management Decisions

There are a number of ways the Court could choose to structure the next phase of the litigation to advance these cases toward resolution, including setting a schedule to take claims, issues, cases, or specific and commonly-situated wells for dispositive briefing; doing the same for trial; or exploring alternative dispute resolution in parallel to any of the above. What is crystal clear at this point is that we are not yet *at* the next phase. The driver of Defendants' proposal is providing the Court and parties with sufficient information about the water districts, wells, and conduct at issue to make informed decisions about an appropriate case management approach. This information is critical because these cases cannot be managed—and they will not be resolved—by "prioritizing" a single case based on its filing date and ignoring the many differences among the water districts and individual wells.

Perhaps the most obvious difference is the actual source of the alleged contamination. Different individuals and entities manufactured, sold, purchased, or used products containing dioxane, disposed of products containing dioxane, or otherwise caused the release of products that may have entered the groundwater in the vicinity of each of the Plaintiffs' wells. These entities may become parties to the case, which will obviously impact case management decisions.[2] And

---

[2] Administrative orders in proceedings relating to remediation sites may provide information on the existing obligations that other parties, *i.e.*, dischargers, have to mitigate or eliminate groundwater impacts that may have migrated to Plaintiffs' wells. For example, Plaintiff Bethpage Water District claims that Bethpage wells 4-1, 4-2, 5-1, 6-1, and 6-2 have been contaminated by dioxane, and alleges that Defendants should be held responsible for damage to those wells. However, dioxane contamination issues associated with those very wells are being, or expected to be, addressed pursuant to an agreement among the United States Navy, Northrop Grumman, and Bethpage. Other Plaintiff water districts

The Honorable Nina Gershon
The Honorable Roanne L. Mann
February 1, 2021
Page 7

beyond that, knowing *who* is actually responsible for the releases at issue will help establish *when* those releases occurred, which products were involved, and in turn which warnings were in place, the state of the knowledge, and the contemporaneous standards by which they should be judged.

The water districts and the wells themselves are also highly differentiated and reflect the hydrogeological environment of Nassau, Suffolk and other relevant counties. The 27 Plaintiff water districts have wells that were built at different times, extend to different depths, into different aquifers, pump at different rates, and are situated under different land uses and sewerage types. With respect to those wells, each of the water providers has addressed, on an individual basis, and over different periods of time, a wide variety of water supply, water quality, and contamination issues, including monitoring for a range of over 400 different possible ground water contaminants, remediation of specific contaminants at individual wells, and well reconstruction and interconnection issues. And each of the water providers has its own history regarding knowledge of potential 1,4-dioxane contamination associated with individual wells.

Against this backdrop, the case- and well-specific issues that need to be discovered, at least preliminarily, to inform case management determinations, include:

- the actual source or sources of the contamination in the wells;

- when and how the releases that produce the contamination occurred;

- the evidence that connects the contamination to a particular defendant's product or warning;

- what distributors and product end-users knew about the proper handling, use, and disposal of solvents and their compliance with laws that applied to the use and disposal of such products;

---

impacted by this same plume include South Farmingdale and New York American Water Company. Another example involves Plaintiff Hicksville Water District, which is involved in at least two other lawsuits against dozens of dischargers arising out of alleged dioxane contamination: *Hicksville Water Dist. v. Jerry Spiegel Associates, Inc., et al.,* 19-cv-6070 (PKC)(SMG)) and *Hicksville Water Dist. v. Philips Elec. N. Am. Corp.,* 17-cv-04442 (ADS)(ARL). Several of the same wells at issue in those actions are at issue in this action against Defendants. The Bethpage plume is only an example of these third-party issues. The EPA and New York Department of Environmental Conservation have identified scores of separate environmental sites in proximity to the wells at issue.

- the decision to locate drinking water wells near industrial operations, landfills, or other areas that Plaintiffs knew made them susceptible to contamination;

- Plaintiffs' knowledge that their wells were in areas prone to contamination and the actions they took, if any, to protect their water supply and limit the risk of such contamination;

- whether Plaintiffs conducted any investigation to determine the source of the contamination on which they base their claims and the results of that investigation;

- whether parties not yet in these lawsuits are already subject to orders or agreements (*e.g.*, Superfund site clean-up agreements) that make them responsible for addressing the contamination; and

- whether Plaintiffs considered any alternatives to the costly treatment systems they propose to install on each well.

In their prior submission, Plaintiffs took the self-serving position that they have already produced enough information to answer these questions. That is inaccurate. Thus far, Plaintiffs have failed to identify any specific point source for the vast majority of wells at issue. If anything, Plaintiffs have shrugged this issue aside, contending that they need not determine the actual source of contamination, identify the actual polluters, or address what those entities knew about the use and disposal of the products they used—a remarkable position in a failure to warn case. And Plaintiffs have consistently resisted Defendants' efforts to discover this information. In addition, information relevant to these determinations has not been produced. Water distribution information remains incomplete for 16 Plaintiff water districts, 11 Plaintiffs have provided no information whatsoever, and pumping information is missing or incomplete for over 25% of the Plaintiffs' Public Water Supply ("PWS") wells. These records and documentation are relevant to source identification, and also to the various mitigation or operational measures available to address any impacted well, including blending or replacement by other water sources.

Third-party discovery to date on these core issues is also far from sufficient to allow for informed case management decision-making. Defendants subpoenaed the New York State Department of Environmental Conservation ("NYSDEC") for relevant information concerning the concentrations and monitoring locations of contaminants measured in groundwater at sites in the State's hazardous waste and cleanup programs and other spill or release sites that are required or voluntarily reported environmental monitoring data to the State. The chemical analytical data for the estimated 90 to 160 environmental remediation sites regulated by NYSDEC in the areas where Plaintiffs allege that their water systems have been damaged has not yet been produced. Thus far, only partial administrative records, consisting of select reports and administrative orders, have

been produced by NYSDEC for fewer than 30 sites. This investigation and remediation information is highly relevant. For example, chemical and water level data from remediation sites are used to define the footprint of groundwater impacts associated with the site and how that footprint changes over time, as well as the effectiveness of the actions taken to mitigate or eliminate the site-specific groundwater impacts.

Defendants also requested concentration and monitoring location data for groundwater and related data from the Suffolk County Department of Health Services ("SCDHS") and Nassau County Department of Health ("NCDOH") pursuant to third party subpoenas. SCDHS has only recently begun to produce water quality data, and NCDOH has yet to produce any. In accordance with the federal Safe Drinking Water Act, and as required by federal and state regulations, public health agencies report water quality data to the EPA. The required water quality analyses include a broad range of chemical parameters that are indicative of the quality and utility of the water that wells produce, including disinfection byproducts and industrial solvents such as 1,1,1-TCA, but also secondary water quality indicators such as dissolved metals and other inorganic compounds. The association of certain industrial chemicals provides critical information on the potential sources of groundwater impacts, and the secondary water quality indicators are important in understanding the aquifer from which a particular well is drawing water. All of this information is still outstanding.

**Defendants' Proposal Would Advance The "Just, Speedy, And Inexpensive Determination" Of These Cases, While Plaintiffs' Approach Would Impede It.**

Defendants respectfully submit that their proposal is far better suited to advance "the just, speedy, and inexpensive determination" of these actions. Fed. R. Civ. P. 1. Allowing depositions and written discovery in *all* of the cases for a relatively brief period puts the parties on equal footing. And Defendants have a fundamental right to gather evidence and test the allegations made against them by each Plaintiff. There is nothing "just" about preventing discovery beyond an initial production of documents and making case management decisions on the basis of untested allegations and in the absence of an informed record.

Defendants' proposal also provides a more speedy and inexpensive path toward resolving these cases, in that it allows for development of a basic record in *all* cases and, in turn, will lead to an ultimate case management plan that can account for the similarities and differences among them. Plaintiffs' approach will simply make it longer to address cases, wells, or issues that could actually guide the parties' thinking about how to resolve these cases short of trying them all.

Finally, Plaintiffs' position fails to come to grips with the practical reality of what it would mean to make SCWA's case the "priority." One of the many ways in which SCWA is not representative of the other Plaintiffs is its uniquely massive scope. SCWA serves nearly all of

# KIRKLAND & ELLIS LLP

Suffolk County, a region covering 912 square miles, serving over 1.2 million customers, through 6,000 miles of water mains. SCWA operates over 600 drinking water supply wells, and has alleged that 1,4-dioxane was detected in approximately 300 of its wells. That case is by far the most fact-intensive and will have the most complex record of any case. It will take a significant amount of time to complete discovery in the SCWA case. Serious thought will need to go into how it can be tried in an efficient manner given the large number of wells, each having its own story.

In contrast, and as an example, the Incorporated Village of Mineola—a region covering only 2.2 square miles in Nassau County—serves approximately 5,616 customer accounts. It operates seven supply wells, and has alleged that five of those wells had detections of 1,4-dioxane. The amount of damages that Mineola may seek is substantial, but far less than SCWA. Likewise, there are only 5 wells at issue in the Albertson Water District case. While still involving substantial claims, these cases are much smaller than SCWA, and will require far less discovery than the much larger SCWA action. These smaller cases may be trial-ready long before SCWA's far-ranging claims. This disparity underscores why it makes no sense to "prioritize" SCWA ahead of other actions at this stage, with no record to justify the very real possibility that doing so will bottleneck every other case and create a morass. More information is needed to identify potential similarities or patterns that may help the parties and the Court come up with a more comprehensive case management plan.

\*     \*     \*     \*     \*

A case management order and schedule along the lines set forth above keeps discovery in each of the 27 cases before the Court moving forward. It includes directives and procedures that require cooperation, protect against gamesmanship and redundancy, and ensure quick Court intervention if disputes develop. Most importantly, it recognizes the varying degrees of complexity of the cases and sets forth a measured, stepwise plan to address them in a thoughtful and efficient way.

Sincerely,

/s/ Nader R. Boulos, PC

Nader R. Boulos, PC