UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
----------------------------X
                            :
SUFFOLK COUNTY WATER         :
AUTHORITY,                   :    17-CV-6980 (NG)(RLM)
            Plaintiff,       :
                            :    May 20, 2021
                            :
            V.               :    Brooklyn, New York
                            :
THE DOW CHEMICAL COMPANY,    :
et al.,                      :
            Defendant.       :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          SCOTT MARTIN, ESQ.
                            STEPHANIE BIEHL, ESQ.


For the Defendant:          STEVEN DILLARD, ESQ.
                            ROBB PATRYK, ESQ.
                            KEVIN VanWART, ESQ.
                            JED WINER, ESQ.
                            JOEL BLANCHET, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE COURT:  This is Judge Mann on the line.

2    I'm conducting a telephonic hearing on a discovery

3    dispute in a series of related cases.  The lead case is

4    Suffolk County Water Authority v. Dow Chemical Company,

5    et al., 17-CV-6980.

6          I hope everyone is safe and healthy.  I'm

7    going to begin by taking the roll call.  Please let me

8    know whether you expect to be the person speaking on

9    behalf of a particular party so I'll particularly focus

10   in on you and remembering your names.  But I do ask,

11   given the number of individuals involved, if you

12   identify yourself for the record before you speak

13   unless it's obvious from the context who is speaking.

14   The other preliminary matter is that I would ask anyone

15   who is not speaking to mute your audio so that we're

16   not plagued with feedback or extraneous noises.

17          All right, I'll hear first -- who is on the

18   line on behalf of plaintiffs' counsel -- on behalf of

19   the plaintiffs.  I think we have three different groups

20   of plaintiffs over these dozens of cases.

21          MR. MARTIN:  Your Honor, it's Scott Martin

22   from the Hausfeld firm in New York.  I am safe,

23   healthy, and fully vaccinated, and I will be speaking

24   on behalf of Suffolk County Water Authority and in

25   particular with respect to the motion to compel for the

1   responses to the interrogatory.

2          THE COURT:  All right, and I assume you have

3   other members of your team who are on the line, so if

4   they would identify themselves as well.

5          MR. LEWIS:  Richard Lewis from Hausfeld.

6          MS. BERAN:  Katie Beran from Hausfeld.

7          MS. BAYOUMI:  Jeanette Bayoumi from

8   Hausfeld.

9          THE COURT:  Anyone else?  I'm sorry, I

10  couldn't hear your name.

11         MS. HERMAN:  (Ui) Herman from Hausfeld.

12         MS. BIEHL:  Your Honor, this is Stephanie

13  Biehl from Sher Edling, also on behalf of Suffolk

14  County Water Authority and all other plaintiffs, except

15  for Hicksville Water District and New York American

16  Water.  I have on the line with me my colleagues, Katie

17  Jones and Matt Edling.  I will be speaking on behalf of

18  plaintiffs with respect to the motion to compel certain

19  documents.

20         THE COURT:  All right.  And for the

21  remaining plaintiffs?

22         MR. SCHIRRIPA:  Good afternoon, your Honor.

23  This is Frank Schirripa from Hach Rose Schirripa and

24  Cheverie on behalf of New York American Water.  Along

25  with me is my colleague, Hillary Nappi, and co-counsel

1    Mary Jane Bass from the Beggs & Lane law firm.

2              THE COURT:  All right.  And do you expect to

3    be arguing or are you deferring to Mr. Martin and Ms.

4    Biehl?

5              MR. SCHIRRIPA:  I'm deferring to Mr. Martin

6    and Ms. Biehl with respect to common issues and

7    responses as addressed in our letters.  But if there

8    are specifics with respect to American Water, I will be

9    addressing those.

10             THE COURT:  All right.  I believe we have --

11   do we have one remaining plaintiff?

12             MS. FACTOR:  Yes, your Honor.  That's the

13   Hicksville Water District, and my name is Lilia Factor

14   from Napoli Shkolnik.  And like my colleague, I will

15   chime in for anything specific to my client but

16   otherwise defer to the other plaintiffs' counsel.

17             THE COURT:  All right.  And is anyone on the

18   line with you on behalf of your client?

19             MS. FACTOR:  No, your Honor.

20             THE COURT:  Who do I have on the line on

21   behalf of the Dow Chemical Company?

22             MR. VanWART:  Your Honor, you have four of

23   us.  It's Kevin VanWart and Nader Boulos.  We're with

24   Kirkland & Ellis, and on the line with us are Joel

25   Blanchet and Andy Devine from Phillips Lytle.  Mr.

1  Blanchet will be handling the bulk of the argument.

2          THE COURT:  All right.  We have several

3  other defendants.

4          MR. DILLARD:  Yes, your Honor.  This is Mr.

5  Dillard, Steven Dillard, along with my colleague,

6  Felice Galant, on behalf of Vulcan.

7          THE COURT:  And do you expect to be

8  primarily deferring to Mr. Blanchet in his arguments?

9          MR. DILLARD:  I think primarily, your Honor,

10 but we may wish to supplement something that may be

11 specific to our client or that we feel should be

12 fleshed out a little bit more, but primarily deferring

13 to Mr. Blanchet.

14         THE COURT:  All right, we have additional

15 defendants.  Shell Oil?

16         MS. BRILLAULT:  Good afternoon, your Honor.

17 This is Megan Brillault and I'm with the law firm of

18 Beveridge & Diamond, and I will be deferring primarily

19 to Joel for argument.

20         THE COURT:  All right.  And Proctor &

21 Gamble?

22         MR. WINER:  Good afternoon, your Honor.

23 It's Jed Winer from the law firm of Weil Gotshal &

24 Manges.  It's just me on the line for P&G.  Like Mr.

25 Dillard said, I'll be largely deferring to Mr.

1   Blanchet.  But if something comes up specific to

2   Proctor & Gamble, I may chime in, or if there's

3   something else that I feel should be fleshed out a

4   little bit.

5            THE COURT:  All right.  Is there anyone on

6   the line, a participant, who has not stated that

7   person's appearance?

8            MR. PATRYK:  Robb Patryk and Amina Hassan

9   (ph) from Hughes Hubbard & Reed for defendant Ferro

10  Corporation.

11           MR. PATRYK:  Good afternoon, your Honor.

12  It's Robb Patryk from Hughes Hubbard & Reed.  I

13  represent Ferro Corporation, one of the defendants.  My

14  colleagues, Domina Hassan (ph) and Sharon Tabatabai I

15  believe are on the line with me.  Like Mr. Dillard, I

16  will refer to Mr. Blanchet unless there's something

17  specific to Ferro that needs to be addressed.

18           THE COURT:  Okay.  Did you say Mr. Patryk?

19           MR. PATRYK:  Yes.

20           THE COURT:  All right.  Anyone else who I

21  may have missed.  All right, so I think we've accounted

22  for all the participants.  This is on to address the

23  two motions and responses that have been filed.

24  There's a motion to compel a response to

25  interrogatories as well as a motion to compel the

1    production of documents.  Both motions were filed on

2    behalf of the defendants and were objected to by the

3    plaintiffs.

4         Let me just address one of the issues that

5    was raised by plaintiffs' counsel in response.

6    Plaintiffs' counsel has complained that with respect to

7    a number of the disputes, that the defendants have

8    failed to meet and confer as required by both the local

9    rules and the Federal Rules of Civil Procedure.  I do

10   note that there has been a back-and-forth exchange of

11   letters between the two sides.  I say the two sides

12   since we're dealing with multiple parties on each side.

13   A meet and confer can be satisfied by an exchange of

14   documents.  It doesn't have to be a physical meeting or

15   even a telephone discussion if the parties in good

16   faith are attempting to resolve or at least narrow

17   their discovery disputes through written

18   communications.

19        That said, having reviewed the parties'

20   submissions, I am concerned that what's been going on

21   is that there's a back-and-forth in which each side is

22   simply digging in its heels, is trying to make a record

23   that it could then append to its motion or response to

24   the motion with the Court, in part to get around the

25   three-page limit and in part to be able to site

1   something alleged to be in support of the position that

2   that party is taking.  In other words, I don't feel

3   like there really has been a sufficient exchange of

4   arguments and compromise by either side in this case.

5   And as we go through these issues, I think that will

6   become more apparent in terms of the Court's thinking,

7   and I hope that, going forward, I'm not going to be

8   confronted with a similar-type situation.

9           So what I'd like to do, even this was not

10  the order of filing, I would like to first address the

11  motion to compel documents.  There are a series of

12  categories of documents that the defendants are

13  complaining were not sufficiently responded to.  The

14  first such category of documents is the electronic

15  database of groundwater test results.  The plaintiffs

16  respond that with the exception of Suffolk County Water

17  Authority, none of the plaintiffs or their consulting

18  engineers have electronic databases of test results.

19          So as an initial matter, just to focus this

20  discussion, do the defendants concede that what we're

21  talking about is whether or not Suffolk County or the

22  SCWA has sufficiently responded to this motion -- to

23  the document demand?

24          MR. BLANCHET:  Your Honor, it's Joel

25  Blanchet from Phillips Lytle on behalf of Dow.  I think

1   that's accurate.  We accept the representation that

2   they don't have electronic databases except for Suffolk

3   County Water Authority.  We're not looking to secure

4   information that doesn't exist, so I think that issue

5   has been narrowed to the electronic database in Suffolk

6   County Water Authority's possession.

7              THE COURT:  All right, so I will -- to the

8   extent that the motion applies to any of the plaintiffs

9   other than SCWA, I'm going to deem the motion

10  withdrawn.  Now, as I understand the parties' positions

11  with respect to SCWA, there in effect are two issues.

12  The first is whether testing results other than one for

13  dioxane and related contaminants are relevant, and

14  secondly, whether the production of the entire database

15  that's been demanded would be unduly burdensome.

16              The plaintiffs have indicated that they have

17  produced testing results relating to dioxane and

18  related contaminants and in the papers, I've seen

19  differing -- a differing count as to whether the

20  related contaminants are four or five.  It's not a

21  consistent number.  But I guess -- I guess my first

22  question for plaintiffs' counsel is, do I understand

23  correctly that the only testing results that have been

24  produced are testing results for dioxane and what you

25  refer to as related contaminants, either four or five

1  of them?

2            MS. BIEHL:  This is Stephanie Biehl for the

3  record.  No, your Honor, additional testing results

4  have been produced on behalf of all plaintiffs,

5  including Suffolk County Water Authority for non-

6  dioxane related contaminants.  Such examples include

7  things like annual water quality reports, quarterly

8  sample reports, and where other ad hoc sample reports

9  have been pulled and appear in the ordinary course of

10  Suffolk County Water Authority business.

11            THE COURT:  I'm actually surprised to hear

12  that.  So are you saying that the database contains all

13  sampling results but then apart from the database,

14  there are these other reports and those have been

15  produced?

16            MS. BIEHL:  That's correct, your Honor.

17            THE COURT:  Since I haven't seen a sample of

18  a report of that nature, would those reports be

19  inclusive of all contaminants that have been found?

20            MS. BIEHL:  No, your Honor.  In some

21  instances, that could be the case but most likely, it

22  is a vast majority of other contaminants that Suffolk

23  County Water Authority is required to test for.  That

24  would be in a report such as the annual water quality

25  report.  It also could be other attributes that are

1    non-chemicals, of P.H. levels of particular water

2    samples that could appear in a particular report, and

3    that may or may not be in reports like annual water

4    quality reports or other ad hoc sampling reports.  The

5    database itself includes all contaminants ever tested

6    for by Suffolk County Water Authority.

7             THE COURT:  I understand that but your

8    answer confused me.  So what is contained in the annual

9    and quarterly reports?  Are contaminants included?  I

10   thought you said no.

11            MS. BIEHL:  They are but they are not all

12   contaminants that Suffolk County Water Authority has

13   ever tested for in its history.  There are specific

14   contaminants that the state and other regulators

15   require the water providers to test for, which is

16   anywhere from 20 to 50 chemicals, depending on the

17   year.  That is what is included in an annual water

18   quality report.  But Suffolk County Water Authority

19   itself tests for over 400 chemicals and attributes per

20   year.  Not all 400 of those would appear in any given

21   annual water quality report.

22            THE COURT:  When plaintiffs say in their

23   letters to the Court and between counsel that they have

24   produced the sampling results for dioxane and the

25   related contaminants, can you explain what you mean by

1  related contaminants and how is a determination made as

2  to what is related?  This may be information that all

3  of you have at your fingertips but the Court doesn't.

4           MS. BIEHL:  Of course, your Honor.  There

5  are five total contaminants.  One of those is one for

6  dioxane.  Four we have informally called the related

7  contaminants and those are chemicals that are tested

8  for from what we call the parent product, which is TSA,

9  which you've seen in the papers, and related

10  contaminants to that, which are breakdown products,

11  sometimes called daughter products.  That's DCE and

12  DCA.  There's one other potentially related

13  contaminant, which is called TCE.  At the beginning of

14  the discovery process in this case, all of the parties

15  agreed that those were the five contaminants that would

16  be exchanged, and that has been the report that Suffolk

17  County Water Authority produced that is over 500,000

18  lines of results dating from 2003 to 2019.

19           THE COURT:  Well, you say that those were

20  the ones that the parties agreed would be produced.

21  Unless I missed something, I didn't see that in your

22  letter in opposition and, frankly, I'm a bit surprised

23  to hear that.  If the parties had agreed to that, then

24  why are we even addressing that issue?

25           MS. BIEHL:  I don't know if it's in our

1   letter.  I can check that for you, your Honor, but it

2   has been agreed to and those are the five contaminants

3   that were specified in the fact sheets, and both sides

4   agreed to the fact sheets after extensive negotiations.

5   So I don't know why we're here on contaminants other

6   than those five but that was what was agreed to during

7   the fact-sheet process over two years ago now.

8            MR. BLANCHET:  Your Honor, it's Joel

9   Blanchet.  I can address that.

10           THE COURT:  All right, go ahead.

11           MR. BLANCHET:  Okay.  The context here is

12   important to understand why the testing database is so

13   important.  At the beginning of this case, when we

14   received the complaint, it was unclear exactly the

15   scope of plaintiffs' claims.  There were allegations

16   about contamination in wells that came from defendants

17   spanning the 70-year time period.  To help suss that

18   out, we agreed to set aside initial disclosures under

19   the Federal Rules and work on fact sheets that would

20   give each party a chance to better understand the

21   claims at issue.

22           As part of that, we zeroed in on, what are

23   the key points that we can start with to help determine

24   what wells are at issue.  Because the complaint focused

25   on dioxane and TCA and we were working to efficiently

1   gather information in a cooperative way, we narrowed

2   down our request to testing for dioxane and the

3   breakdown products of TCA.  That was in lieu of initial

4   disclosures.

5           Since then, and this is the important part,

6   it's become clear that plaintiffs' claims are very

7   broad.  They allege contamination occurred in 600-plus

8   wells across Long Island over a 70-year time period.

9   The facts that complicate the inquiry into each of

10  those 600-plus wells is, whose product is in that well

11  and where did it come from?  There are multiple parties

12  that aren't part of this case right now who, like some

13  of the defendants, produced TCA solvents and sold them

14  and put them in the market.  They're not in front of

15  the Court.  The question becomes, what responsibility

16  if any do any of those parties have for contamination

17  that exists in any of these wells?

18          Another complicating factor is, the

19  defendants before this Court -- insolvents are not the

20  only source of dioxane.  As everyone will agree, there

21  are an undefined universe of mass-produced consumer

22  products that contain dioxane.  Those may be a source

23  of contamination in some of these 600-plus wells.  The

24  other key fact here is that none of the defendants that

25  are in this case are accused of releasing dioxane into

1    the environment.  They did not operate facilities on

2    Long Island, they have not been held responsible

3    parties under CERCLA or RCRA.

4            So there are a group of third parties that

5    released dioxane somewhere, either because they're

6    using mass-produced products as part of a residential

7    use or they were associated with a facility on Long

8    Island that was using solvents including TCA and

9    possibly other solvents that at some point over the

10   last 70 years, entered the ground water and after

11   entering ground water, made their way to one or more of

12   the 600-plus wells at issue.

13           The other important thing to keep in mind is

14   that these releases occurred, and this is right in

15   plaintiffs' complaint, at various times, at various

16   locations, and in various amounts.  The other thing to

17   keep in mind that's unstated but implicit in the claim

18   is that the releases occurred of different products,

19   not necessarily the products associated with the

20   defendants on the line, at different times, involving

21   different warnings and different product literature,

22   and with different outcomes as a result of that

23   contamination.

24           The Long Island Aquifer is not a swimming

25   pool.  It is not the case where a drop of dioxane goes

1   into the aquifer and it spreads across the thousand-

2   plus square miles of Long Island and penetrates every

3   well.  Each well is separate and that's what we're

4   talking about here.  Each of the 600-plus wells at

5   issue in this case is separate.  The dioxane that's in

6   those wells came from different releases at different

7   times, of different products, involving different

8   parties.

9          That's what makes the access to the entire

10  testing database so critical here, because in one spot,

11  a well may be contaminated pretty clearly from a known

12  environmental site, where there's been a RCRA or a

13  CERCLA or a state superfund investigation and we know

14  who those third parties are.  In other spots, there may

15  be a well that has dioxane in it but it's not

16  especially clear where the dioxane came from, and

17  that's what we need to figure out for 600-plus wells.

18          This isn't novel.  It's something that can

19  be done and is done.  It is the basis for state

20  superfund laws.  There are investigations -- when

21  contamination is found, there are investigations to

22  find where that contamination came from, and then

23  consent degrees or agreements to clean it up in one way

24  or the other.  The complicating factor here is not the

25  actual work.  That's tried and true work and one of the

```
1    things that is used by consultants and remediation
2    specialists to determine where the contamination came
3    from is a comparison between all the contaminants that
4    may exist in a well and all contaminants that have been
5    identified at a different site.
6            THE COURT:  Hello?
7            MR. BLANCHET:  Yes.
8            THE COURT:  I'm sorry, you're breaking up.
9            MR. BLANCHET:  I'm sorry, I'll try to speak
10   up, your Honor.
11           THE COURT:  No, you're breaking up so it's
12   not that -- I think there's a problem with the
13   connection.  I don't know if it's on your end or mine,
14   but you cut off mid-word.  Can you hear me?
15           MR. BLANCHET:  I can hear you.  Can you hear
16   me?
17           THE COURT:  I can but you said -- you were
18   talking about, to determine where the contaminants come
19   from, and you said you compare, and you cut off.
20           MR. BLANCHET:  Okay, I can pick up from
21   there.  There is a profile of contaminants in, for
22   example, a Suffolk County drinking well.  That is, at a
23   certain point in time, the contaminants -- it may be
24   dioxane but it may also contain contaminants completely
25   unrelated to dioxane, so benzine or something else.
```

1    And the way to figure out where that dioxane came from

2    is to take the whole of the contaminant profile in the

3    well and then take -- compare that to, for example,

4    known superfund sites, where the testing at the site

5    and they have a suite of chemicals.

6            If the suite of chemicals from a known

7    superfund site matches up to a suite of chemicals

8    that's found in an individual supply well, it's pretty

9    good evidence that there is a connection between that

10   superfund site, which may be a mile way, maybe a half

11   mile away, maybe three miles away, and the supply well.

12   And then remediation decisions and responsibility for

13   the contamination of that supply well can be drawn.

14           The issue here is we have a lot of wells.

15   Long Island is home to over 440 state superfund sites,

16   each of which has different histories with different

17   products and different contaminants.  So to get to the

18   bottom of that, it can be done but it's a lot of work.

19   And what the consultants need is access to a database

20   that contains the full suite of testing data for the

21   wells that Suffolk County has, so that we can go back

22   to environmental investigations that have been done at

23   known sites and compare those.  It's a methodology that

24   is used all the time.

25           The database itself -- I'm surprised at the

1  notion that this is somehow burdensome for plaintiffs

2  to produce.  It is electronic, it can be -- it's not a

3  person in a warehouse making copies or digging through

4  files to locate them.  We are more than happy to work

5  with plaintiffs to overcome any technical issues and if

6  there's a good reason why portions of that database are

7  not easily copied or we're not easily given access to

8  them, we're happy to work with them on that.

9          But what we've received is -- since we've

10  made the request for the entire database 14 or 15

11  months ago, what we've received is varying degrees of,

12  well, let's talk about it some more or it's burdensome

13  but let's talk about it some more.  We're at a point

14  now where we have deadlines that are coming up fast for

15  the identification and the naming of third parties, so

16  access to that database and the ability to manipulate

17  it in the same way that Suffolk County is able to is

18  critical to solving these problems and getting to the

19  bottom of these issues for the 300-plus wells that

20  Suffolk County has in play, in an efficient and timely

21  manner.

22          THE COURT:  Well, one of the objections that

23  plaintiffs raised is that when they asked you to

24  describe the contaminants -- you know, what

25  contaminants do you need, that you didn't come back and

1    suggest a subset.  I understand you're now saying you

2    need the entire database.  Did you actually talk with

3    plaintiffs' counsel in the way you just relayed to the

4    Court as to why you need this?  Did you suggest that

5    perhaps you get the subset to show -- to be able to

6    show why you need it and how it would be used or any of

7    those -- did any of those discussions take place?

8              MR. BLANCHET:  Yes, and in one or more of

9    the letters that we've exchanged over the course of the

10   last year, we cited for them the -- I think it's an EPA

11   document that I believe is in our letter as well, that

12   the forensic tool for evaluating environmental

13   contamination that makes this fingerprinting point.

14   Plaintiffs are a sophisticated party.  They understand

15   how this is done.  They understand the significance and

16   the volume of superfund investigations that have

17   happened on Long Island.

18             Frankly, your Honor, my understanding and

19   working assumption is that it will just be easier and

20   more efficient for everyone if we just get the

21   database.  That way, we don't have to go back to the

22   well.  Believe me, the meet and confer --

23             THE COURT:  No pun intended.

24             MR. BLANCHET:  Right, exactly, exactly.  I

25   think I can speak for a lot of the defense counsel when

1    I say we have no desire to have a scrap of paper or a

2    bit of information that we don't need.  We have -- the

3    volume isn't the problem, it's the substance of it.  If

4    we can get access to it in a comprehensive way that is

5    efficient, then our experts and consultants can work

6    with it in the same way that plaintiffs' experts and

7    consultants can work with it.

8           It's not a novel request.  It happens a lot

9    in these types of cases.  The difficulty here is, it's

10   hard to pin down a subset or a time period because of

11   the scope of plaintiffs' claims.  It's 70 years and,

12   for Suffolk County, 340-plus wells, each of them with a

13   different, what they call a capture zone, that is the

14   space within which the well itself draws water.  That

15   capture zone will be influenced by various factors, and

16   in some cases, it may be connected to a known superfund

17   site with a known profile of contaminants.  In other

18   cases, it won't.  And because there are so many wells,

19   it is more efficient if we just get all the data at

20   once.

21          Again, if there are technical issues, we're

22   happy to -- and we suggested this early on in the case.

23   We're happy to have technical people talk to each other

24   on the phone and work through those issues.  Our goal

25   here is just to get the information efficiently and in

1    a manner that is fair and allows our consultants to

2    manipulate it and get what they need without creating a

3    separate dispute or having to go back to plaintiffs

4    each time.

5            THE COURT:  One of the things you mentioned

6    when you talked about the scope of the claims is the

7    time period.  Do you even know -- for the electronic

8    database, do you even know what the time period is,

9    what testing results are captured electronically?

10           MR. BLANCHET:  We don't have full visibility

11   into that.  Plaintiffs have that information.  It may

12   be the case that it's for a truncated time period.

13   That's fine.  I mean, I think part of the issue is,

14   we've been having trouble getting straight, clear

15   responses from plaintiffs.  We're not asking them to

16   create anything that doesn't exist and we're trying to

17   avoid creating any burden or certainly any kind of

18   delay in this.

19           But we know that they have a system and the

20   various reports that they have produced, including

21   these annual reports, those are ad hoc and they're

22   driven by specific regulations and specific reporting

23   requirements.  They're not really what the consultants

24   in this case need to be able to drill -- another pun --

25   drill down on each well and understand, where did the

1  contaminants in this well, where did the dioxane in

2  this well come from, so we can understand it and then

3  identify what one -- did it come from a product of one

4  of the defendants in this case because if it didn't,

5  that's obviously a big part of the defense here.

6         If it came from a third party who is a known

7  polluter on Long Island, who is already subject to a

8  consent decree that requires them to clean up the mess

9  that they made or is subject to -- been cited for

10 environmental violations in the past.  That is

11 obviously a relevant fact because if they are warned

12 not to put a contaminant in the ground and they do it

13 anyway, then the liability if any that exists likely

14 rests with them rather than with any of the defendants.

15        Again, this is the whole basis for CERCLA

16 and state superfund laws, to identify the specific

17 source, the PRP, the potentially responsible party, so

18 that they can take responsibility and participate in or

19 take ownership of the cleanup.  We've skipped that

20 here.  Plaintiffs have gone to a very narrow subset of

21 parties that produced and sold a product containing

22 dioxane, named them, and as we understand it, they're

23 claiming that each of the defendants in this case,

24 their dioxane exists in each of 600-plus wells.  We

25 want to test that.  We don't believe that's true.  But

```
 1   the way to test that is a fact-intensive investigation
 2   that's done all the time, but the complication here is,
 3   there are so many wells that there's a lot of data that
 4   needs to be processed and a lot of information that
 5   needs to be gathered and sifted through to make those
 6   determinations.  Also, your Honor, we have deadlines
 7   that we'd like to meet but this is part of making that
 8   determination of who the third parties may be who we
 9   may want to join to the case.
10           THE COURT:  As I understand the plaintiffs'
11   burdensome argument, they say that some of the data is
12   archived.  Presumably, if we're talking about archived
13   data, it is much more difficult to retrieve.  I think
14   plaintiffs said it's accessible only -- not to the
15   plaintiffs but to IT specialists.  Are the defendants
16   prepared to shoulder the costs of whatever it takes to
17   obtain the databases that you're looking for?
18           MR. BLANCHET:  That's a good question, your
19   Honor.  I don't want to give an absolute answer but
20   certainly I think if the costs are reasonable and we
21   make the determination that the information that we
22   want is worth it, then I suspect that the defendants
23   would come together on that and agree to shoulder the
24   burden of any costs.  But I think it starts with the
25   principal that if it exists, then we should have the
```

1  technical people talk about the best way that we can

2  have access to it in an efficient way.  And if there

3  are costs involved, certainly we would not draw a line

4  in the sand and say we wouldn't shoulder those costs.

5          THE COURT:  Well, I can appreciate that you

6  don't want to sign on to have to pay costs that are

7  objectively unreasonable.  On the other hand, you just

8  make some comment to if it's data that you -- I forget

9  the exact words that you used --

10          MR. BLANCHET:  Right.

11          THE COURT:  -- if you need the information.

12  You're trying to convince the Court that you do need it

13  so what information do you possibly not need?  Are you

14  saying that you would be satisfied with a subset, and I

15  will certainly ask plaintiffs what data are archived,

16  starting from what period of time.  When does the

17  accessible database start?  Do you want to respond to

18  that and to your suggestion that maybe it wouldn't be

19  worth the cost?

20          MR. BLANCHET:  The problem here is I'm a

21  little bit blind as to what's archived and the costs

22  involved in that.  At some point, the expense and the

23  trouble will outweigh the usefulness.  But because I

24  don't know what it is and I don't know what the expense

25  and trouble is, and I haven't had the benefit of

1    conferring with the other defendants or my client, I

2    don't want to get too far out on a limb.  But as a

3    principal, I would recommend to our group and to the

4    client that we pay for reasonable costs associated with

5    getting whatever testing data they have for the wells

6    at issue.

7              THE COURT:  All right, you said you didn't

8    have the opportunity to discuss this with plaintiffs.

9    I assume plaintiffs will say you had the opportunity

10   but you didn't avail yourselves of it.  Now we're all

11   together and you may have to get together in the future

12   and really meet and confer, but let me hear the

13   plaintiffs' response.

14             MS. BIEHL:  Sure, your Honor.  For the

15   record, this is Stephanie Biehl again.

16             THE COURT:  Thank you.

17             MS. BIEHL:  I want to start by taking us

18   back a step, which is the burden question your Honor

19   asked about, which is always in the proportionality

20   context, which always depends on the relevance of the

21   discovery requested.  Mr. Blanchet said a lot of things

22   in the past 15, 20 minutes but what I didn't hear, say

23   for one example of benzine thrown off the cuff, was any

24   potentially related contaminant that shows how dioxane

25   would move or how it would be in the aquifer or how any

1   of the other related contaminants that were agreed to

2   would move in the aquifer.

3           That's important because the

4   "fingerprinting" description that Mr. Blanchet gave was

5   not exactly accurate.  Of course, I don't know any of

6   his experts yet in the case but I find it very hard to

7   believe one of his experts would say e.coli, for

8   instance, is indicative of dioxane contamination and

9   how dioxane moves throughout the aquifer and gets to a

10  well.  Honestly, the same thing would be with benzine.

11  The way a benzine plume moves throughout the aquifer is

12  entirely different than how one for dioxane and TCA and

13  the related breakdown products would move.  That is why

14  all contaminant history for Suffolk County Water

15  Authority has no relevance to this case.

16          Taking the burden part, I do want to step

17  back and remind -- I believe this was explicit in our

18  letter but it's not technologically feasible to just

19  copy the database as Mr. Blanchet and defendants would

20  like.  The reason for that and the best analogy I can

21  give is that the database lives as a sort of Google, if

22  you will.  It's searchable, you can input data on the

23  back end.  It lives in the background and when you type

24  things in, you run queries, something pops up on your

25  screen that is specific to what you want.  You can't

1    technically copy Google so that it's usable for someone

2    else.  That is the same truth for the current database

3    that Suffolk County Water uses.  And the answer to your

4    Honor's question about the time span, your Honor, is

5    that data is queryable on multiple systems back to

6    2000.  Several systems are archived other than the

7    current version that Suffolk County Water uses.

8            And then finally, in response to your last

9    question about whether the defendants have responded to

10   our request to run reports for specific contaminants

11   like benzine, if they want benzine reports, we can run

12   that.  We've offered that but they've never identified

13   one let alone a group of specific contaminants that

14   they or their experts wants.  That offer remains open.

15   Reports are able to be run.  They're incredibly

16   burdensome on their own.  I'm sure you saw that just

17   the five contaminants that we've run already was

18   hundreds of thousands of lines of data and crashed the

19   system, but that's a burden that, compared to the

20   relevance of certain contaminants, we're willing to

21   take again for Suffolk County Water Authority if the

22   defendants can identify a subset of contaminants.

23           MR. BLANCHET:  Your Honor?

24           THE COURT:  Go ahead.

25           MR. BLANCHET:  This is Mr. Blanchet.  I

 1   mean, this is it seems to me something that technical

 2   people who are familiar with the database ought to be

 3   able to get on the phone, work it out, and we can come

 4   to a decision relatively quickly.  As I said, we're not

 5   interested in information that's irrelevant or

 6   prohibitively difficult to get at.

 7            At the same time, we need more than we have

 8   and we don't want to have to go to plaintiffs every

 9   time or consultants come to us and say, we need this

10   specific information for this well during this time

11   period because there's a drag in that where we get to

12   plaintiffs and they will get back to us when they get

13   back to us, and it just won't proceed efficiently or

14   effectively.  So it seems to me that the most prudent

15   thing to do is for the Court to instruct us for our

16   technical people to confer as soon as possible, early

17   next week, get to the bottom of this, and then we can

18   report back to the Court on what protocol or decision

19   we've come to.

20            THE COURT:  In terms of the database being

21   queryable -- I'm not sure if that's an actual word but

22   Ms. Biehl used it so I'll repeat it, and if it isn't a

23   word, it ought to be.  So if you could get information

24   -- a queryable database back to 2000, would that be

25   sufficient?

1        MR. BLANCHET:  It's a bit of the art of the

2   possible.  We'll take what we can get in an efficient

3   and reasonable way.  If it goes back to '98, all the

4   better.  If it's only available to 2007, then we get

5   what we can get.  Again, we're not trying to create

6   complications here.  We're trying to make it easier on

7   everybody by having an efficient exchange of

8   information where everybody is working with the same

9   data.

10        THE COURT:  Do you have anything you want to

11   say in response to Ms. Biehl's argument that the

12   database is not -- can't simply be copied and exported?

13        MR. BLANCHET:  Well, we don't have the

14   database so I cannot comment on that other than, they

15   haven't provided any sort of evidence other than

16   statements in letters, nothing from a technical person

17   that explains why that may be the case.  It's different

18   than my understanding from speaking to consultants but,

19   again, I think it's just a matter of getting technical

20   people on the line and figuring it out.

21        THE COURT:  Ms. Biehl, when you said the

22   database is queryable back to 2000, that assumes that

23   you're not going back to archived data?

24        MS. BIEHL:  That's correct, your Honor.

25        THE COURT:  Mr. Blanchet is certainly

```
1    correct that the plaintiffs really have made no
2    showing, no evidentiary showing with respect to the
3    burden.  When I read your responsive letter, in which
4    you said it would be unduly burdensome to produce the
5    database that defendants are requesting, there were two
6    cites.  They were simply counsel's previous letters and
7    it's simply counsel's representation that it would be
8    unduly burdensome, but I don't think at this point,
9    you've made the necessary showing.
10           And while one can imagine that having access
11   to the database would include contaminants that are not
12   relevant, that doesn't mean that the database is
13   irrelevant.  I think Mr. Blanchet has made a sufficient
14   showing that the defendants need this information in
15   order to be able to pursue their defenses.  I
16   understand the plaintiffs disagree with the theory of
17   the defense but they have consultants who need the
18   information in order to pursue certain defenses.  And
19   to the extent that that information is accessible, it
20   ought to be produced.
21           So I think -- at this point in time, I'm not
22   going to make a ruling with respect to the scope.  I do
23   think that experts should be talking and not just the
24   attorneys.  The attorneys should certainly participate
25   but I think that those with the technological expertise
```

1  should be a party to those discussions so that you can

2  talk about what's feasible, what costs are involved.  I

3  don't think -- if it is feasible to copy the database

4  but it's very costly, then I think the defendants

5  should make a determination as to whether or not the

6  information is worth it to them.

7          Perhaps with the assistance of the experts,

8  there's a way to narrow down what the defendants are

9  looking for but I don't think that it's a sufficient

10  answer to say to the defendants, well, anytime you want

11  a test run on a particular well, when we're talking

12  about hundreds of wells, you tell us what contaminants

13  you want run and we'll produce it.  That is not an

14  efficient use of anyone's resources.  So I'm going to

15  direct the parties and their experts, technological

16  experts to meet and confer.  I'd like a statute report

17  a week from today.

18          MR. BLANCHET:  Thank you, your Honor.

19          THE COURT:  All right.  The next issue

20  concerns the defendants' demand for electronic

21  groundwater models.  They also seek distribution

22  models.  Let's first address the groundwater models.

23  The plaintiffs respond that most plaintiffs do not have

24  groundwater models, that the only ones who do, again,

25  are Suffolk County Water Authority or at least its

1   third-party consultant, CDM Smith, and that three other

2   plaintiffs, specifically Hicksville, Garden City, and

3   Bethpage, have limited groundwater models in the

4   possession of third party H2M.

5          So let me just confirm that we're only

6   talking about those three plaintiffs.  Is that correct,

7   Mr. Blanchet?

8          MR. BLANCHET:  That's my understanding and I

9   have no reason at this point to question plaintiffs'

10  representation about what exists.

11         THE COURT:  All right.  The plaintiffs

12  allege that third party CDM Smith has already produced

13  a groundwater model for the SCWA.  So my question to

14  Mr. Blanchet is, do you agree with that and if so, why

15  do you need the model produced by SCWA.  And if it's an

16  issue of authenticity, would a stipulation regarding

17  the third-party model moot this issue with respect to

18  SCWA?

19         MR. BLANCHET:  Yes, it would moot the issue.

20  Again, here, this is -- this is to me a relatively

21  straightforward issue that I think could be resolved

22  quickly.  We don't have a full understanding of the

23  models that exist that we don't have.  We understand

24  that these models are fairly easy to copy and are

25  commonly produced in these cases.  They're relevant

1   because they determine for specific wells where the

2   groundwater flows and where it came from, and so we'd

3   like a copy of them.

4              THE COURT:  Well, I wasn't asking you to

5   address relevance.

6              MR. BLANCHET:  Okay.

7              THE COURT:  We have a number of issues to

8   address and I have specific questions for both sides.

9   You've said that a stipulation on authenticity would

10  resolve the issue as to SCWA.

11             So let me ask the plaintiffs, can we resolve

12  this issue?  Rather than having SCWA have to reproduce

13  this, is there any issue about authenticity?

14             MS. BIEHL:  I don't think so, your Honor.

15  The model that CDM Smith produced is the exact same

16  product that Suffolk County Water Authority uses.  So

17  if CDM Smith needs to verify the authenticity of that

18  model, that's fine.  I will say that there is a far

19  more recent, publicly available model prepared by the

20  USGS and that is, again, publicly available.  The CDM

21  Smith model I believe was in 2003 was the last update

22  to that model.  So I think this issue can be resolved

23  if the defendants go and get the publicly available

24  model, which applies to all of Long Island, not just

25  Suffolk County Water.

```
 1              THE COURT:  And you say that's a publicly
 2   available model that was generated by what agency?
 3              MS. BIEHL:  The U.S. Geological Survey.
 4              THE COURT:  And you said it applies to all
 5   of Long Island?
 6              MS. BIEHL:  Yes.
 7              THE COURT:  And when was that generated?
 8              MS. BIEHL:  I think in December, your Honor,
 9   of 2020, sometime around there.
10              THE COURT:  This is -- if all of this is
11   true, this is an issue that rather than the parties
12   digging in their heels, if they had talked with one
13   another, they would not have had to burden the Court by
14   presenting it to the Court for resolution.
15              Mr. Blanchet, do you want to respond to the
16   -- to the claim that there's an even more recent model
17   and it's available for all of Long Island?
18              MR. BLANCHET:  That is true.  It was
19   published in November of 2020 but it does not address
20   the reason why we want the existing model.  It doesn't
21   obviate our request for the models that reside with the
22   plaintiffs.
23              THE COURT:  Because?
24              MR. BLANCHET:  Because one of the issues
25   that will be in this case is the decisions that were
```

1   made about where to place some of the wells.  Some of

2   the wells that are at issue, the 600-plus wells, were

3   drilled in 2019, and those required well permits and

4   investigations, which likely include modeling.  So the

5   question is -- some of these wells were drilled into

6   areas that contain dioxane.  On what basis did the

7   plaintiffs make these decisions?  If they had a model

8   available to them and they were using it, what did that

9   model tell them?

10          The other factor is, to the extent that the

11   modeling comes down to a need to insert/input

12   assumptions about certain things, groundwater flow.

13   The assumptions that the plaintiff has made in the past

14   may be very relevant to the assumptions they make now,

15   the assumptions in the normal course of business, non-

16   litigation, versus where we are now, where they're

17   plaintiffs in a lawsuit.

18          THE COURT:  Well, what you're suggesting is

19   that the reason that you want the groundwater model

20   from SCWA is not simply for authenticity purposes but

21   to be able to prove that SCWA had access to that model.

22          MR. BLANCHET:  That's correct.  We don't

23   have full visibility, we don't have an itemized list

24   from plaintiffs about what models they have.  I don't

25   know if they have that but if we already have the

1    model, then obviously -- maybe not obviously but yes, a

2    stipulation would suffice.  If there are models that

3    they have that they haven't produced, those are the

4    ones that we want to see.

5              THE COURT:  All right.  Ms. Biehl, you've

6    indicated that the defendants have a groundwater model

7    that they've obtained from CDM, so what if any models

8    has your client, SCWA, had access to?

9              MS. BIEHL:  No other models, your Honor.

10   Suffolk County Water Authority uses the CDM Smith model

11   that has already been produced.

12             MR. BLANCHET:  Just so I'm clear, your

13   Honor, if the representation is that all the models

14   that they have within their possession, custody, and

15   control have been produced, that's the first I've heard

16   about it.  But if that's the representation, then I

17   think we're done.

18             THE COURT:  Well, I hope so.  So if you want

19   to put that in writing, you can, but SCWA is not

20   claiming to have had access to any other models, at

21   least not before the publication of the U.S. Geological

22   Survey model.  So just reduce that to writing.

23             We have three other plaintiffs who -- they

24   have limited groundwater models that are in the

25   possession of third party H2M.  The plaintiffs claim

that those models are irrelevant because they weren't created in order to model one for dioxane contamination movement and that they would be unduly burdensome to produce.  In particular, with respect to the issue of burden, the argument is that special software is required.  However, there is no form statement from any expert about what would be entailed in producing the requested models.

Mr. Blanchet, do you want to address the relevance issue?

MR. BLANCHET:  Yes.  The relevance issue is -- and this is a unique fact about the need for information.  Dioxane is missable in groundwater.  What that means is, there's other contaminants that will stick to soil, so they will not move at the same pace or with the water.  The water will pass through them.  Some of the contaminants will be picked up by the water and move on while the main body of contaminants stays in a plume attached to the soil.

Dioxane, as plaintiffs allege in their complaint, is missable, so it travels with the groundwater at the same speed, in the same direction, through the same pathways.  So in a very real respect, any model that models the groundwater on Long Island in or near the wells that we're talking about will tell us

1    how the dioxane moves as well.  That's the reason for

2    the request.  If it didn't have anything to do with

3    dioxane, we wouldn't want it.  Again, we're not trying

4    to collect information that's irrelevant.

5              THE COURT:  All right, I'll hear from Ms.

6    Biehl in response.

7              MS. BIEHL:  Yes, your Honor.  These models,

8    which are in H2M, the third-party engineer's

9    possession, are also duplicative of what's available in

10   the CDM Smith model that has been produced.  The CDM

11   Smith model is Long Island-wide so it covers the

12   groundwater of the entirety of Long Island.  That

13   includes the Hicksville water district model, the

14   Garden City water district model, and the Bethpage

15   model.

16             So I'll stop there and say, I think that

17   solves the issue, which is if the defendants review the

18   CDM Smith model, they will get exactly what they would

19   get, we presume, from the other models.  But we don't

20   even know for sure because what H2M has told us is that

21   these are either inaccessible, they haven't been able

22   to find these models, or they're archived.  That is why

23   the burden is also undue to produce those models in

24   light of the fact that the CDM Smith model has already

25   been produced.

 1          THE COURT:  Well, did H2M create the model

 2   from the CDM Smith model?  In other words, did they

 3   just take a portion of that model and use it as their

 4   own, or did they generate their own model?

 5          MS. BIEHL:  Your Honor, we don't know that

 6   and H2M doesn't know that either at this point.  We

 7   have asked that question and are continuing to dig and

 8   try to find the people who actually worked on these

 9   models, and those people are just not there anymore or

10   they don't know.

11          THE COURT:  When did H2M first either create

12   form whole cloth or from the CDM Smith model the model

13   that it had at some point?

14          MS. BIEHL:  The models relevant here and

15   cited in the letter are dated 2004 and 2007.

16          THE COURT:  And if I recall correctly, the

17   CDM Smith one was from 2004?

18          MS. BIEHL:  I believe 2003, your Honor.

19          THE COURT:  2003.

20          Let me ask Mr. Blanchet, are you -- is this

21   different from your discussion about the groundwater

22   models?  This is not an issue of what the plaintiffs

23   knew and when they knew it but actually, you want to

24   know how the moves, you know, so the relevance isn't

25   what the plaintiffs had access to.

```
 1           MR. BLANCHET:  I believe it's more of the
 2   former but I hate to draw a hard line without seeing
 3   it.  But certainly what they knew it is a reason we
 4   would want to see it.
 5           THE COURT:  Well, it sounds like we don't
 6   even know -- let's say that H2M has these models but
 7   they never shared them with the -- I guess it's the
 8   three plaintiffs.  They had them so they provided --
 9   they used them and they would provide some reports that
10   they may have taken into account, what the models
11   showed, but the plaintiffs never had access to them.
12           MR. BLANCHET:  If they never had access to
13   them and no decisions were made based on them, then
14   they may not be relevant at all.  It's just early and
15   difficult to tell given what the claims are and what we
16   know.  We haven't seen it, we don't know what it says,
17   so it's difficult for me to opine on that now.  But it
18   could be the case that we see it and it's not relevant,
19   certainly.
20           THE COURT:  Well, and it may be that you
21   don't have to see it to determine that it's not
22   relevant.  If you have other information that the
23   plaintiffs never had access to it -- let's assume that
24   H2M can't locate it now and they can't locate the
25   individuals who created it.  You have the CDM Smith
```

1   model and there's nothing to suggest that these three

2   plaintiffs, Hicksville, Garden City, and Bethpage, had

3   access to it.  Don't you have everything you need then?

4           MR. BLANCHET:  That may be the case and I'm

5   happy -- the thing I think we're trying to balance here

6   is, we're happy to defer this until after we take the

7   deposition, a 30(b)(6) deposition of H2M or the

8   plaintiffs so that we can get more visibility into

9   that.  But I'd hate to be in a position where it

10  becomes very clear very quickly that it is relevant and

11  it should have been produced a long time ago.  I want

12  to avoid that.  But if plaintiffs believe that it is

13  relevant -- is irrelevant or duplicative and the burden

14  is such that it would take a lot to just give us a

15  copy, then we'll defer it until the deposition process.

16          THE COURT:  The Court has been provided with

17  insufficient information at this point to make a ruling

18  on this but the parties really ought to confer with one

19  another and with their respective experts.  H2M -- I'm

20  not sure what it means.  On the one hand, plaintiffs'

21  counsel is now suggesting that they don't -- they can't

22  find this information.  On the other hand, in the

23  letter, there was a suggestion that special software is

24  required.  Again, there was no sworn statement from an

25  expert on that so I am not going to rule on this at

1    this time.  I'm going to deny the application without

2    prejudice but the parties really ought to do some

3    serious discussions about the need for it, whether it's

4    necessary, and finding out the factual predicates.

5           Another issue that the defendants have

6    raised is their demand for a drinking water

7    distribution model.  The plaintiffs contend that this

8    requires licensed software, and they also point to the

9    fact that they've already produced distribution of

10   surface-area maps as well as well-by-well pumpage

11   histories.

12          So one question I have for plaintiffs'

13   counsel is, what's the difference between a map and a

14   model?  Is there a difference?

15          MS. BIEHL:  There is a difference, your

16   Honor.  A map is more of a typical "document," which

17   shows you where the distribution zone goes for each

18   particular plaintiff and where the surface area is for

19   each particular plaintiff.  A model only does one thing

20   in a very limited sense.  You think of it like an

21   illustration, a live illustration and based on only

22   single point in time.  You can't look back, you can't

23   look forward.  It tells you based on what my water

24   system is pumping right now, where's my water going

25   right now at this point in time.

1           Distribution models are sometimes -- one

2   example it's used for is, if there's a fire happening

3   somewhere in plaintiffs' service area, someone is going

4   to want to look and say, how much water do I have

5   pumping to get to those fire hydrants in the vicinity

6   of the fire.  The model itself does not show what

7   defendants think and want it to, frankly, which is when

8   Bob Smith watered his lawn in 1991 for 45 minutes and

9   where that water might have gone.  That's not a thing

10  that the distribution model can ever do, ever did, and

11  does today.

12          THE COURT:  So you say it's a snapshot at a

13  particular point in time?

14          MS. BIEHL:  Exactly.

15          THE COURT:  All right, I'll hear from

16  defense counsel, Mr. Blanchet.

17          MR. BLANCHET:  Thank you, your Honor.  I

18  think I have a fundamentally different perspective on

19  what the model can do.  It is manipulatable.  If it was

20  a snapshot, it would be a map.  It can tell us what the

21  system itself is capable of.  So when the water is

22  drawn from an individual well, does that water need to

23  go to neighborhood A or to neighborhood B?  The model

24  can be used to determine, if you shut off well A, can

25  you draw enough drinking water from the other wells so

1    that you're not drawing from a well that has dioxane in

2    it.  You don't need that well.

3           That's my understanding of the model.  It is

4    manipulatable, it has data in it, and you can do runs

5    of the model, determine what the system itself is

6    capable of.  It also provides more details about the

7    mapping of where the various -- I think it's like 6,000

8    miles of pipes in the Suffolk County system, where the

9    water that they draw out of the ground goes to and

10   where it could go to.

11          Again, this falls into the same category, I

12   think, as the database.  It's the art of the possible.

13   We understand that it exists electronically.  There

14   ought to be a technical way to share it.  We're not

15   looking to create make work, but it would be useful for

16   our investigation to be able to have the same access to

17   it that plaintiffs have.

18          THE COURT:  Well, I'm not sure that it's the

19   same as the testing database because the testing

20   database, as I understand it, is a repository of data

21   inputted over time.  I don't know whether the model,

22   whether that's something that -- I don't know whether

23   you can go back in time with that.  Are you suggesting

24   that you can?

25          MR. BLANCHET:  Well, I think it depends on

1    what we're focusing on.  As I understand it, you could

2    take the model and say, in January of 2020, we took

3    this amount of water from well A and sent it to these

4    customers.  The model would tell you if you could have,

5    instead of that, shut down well A and still provided

6    products for those customers.

7              It's a big issue in the case because one of

8    the issues that plaintiffs have claimed is that these

9    million-dollar AOP systems need to be attached to every

10   well with dioxane in it and a question is, what if you

11   just shut down the well or blend the water from

12   different wells so that the concentration of a dioxane

13   is at a sufficiently low level that an AOP system isn't

14   necessary?

15             My understanding of it is that the model

16   will tell you whether you can do that, what is possible

17   and it shouldn't be, because it exists in electronic

18   form, a difficult task to get us access to it.  There

19   may be technical challenges.  Again, we're happy to

20   work through those.

21             THE COURT:  Ms. Biehl, anything you want to

22   add?

23             MS. BIEHL:  Yes, your Honor, just to clarify

24   that Mr. Blanchet is talking about a hypothetical

25   model.  Suffolk County Water Authority's model does not

1    go back in time, cannot go back in time.  That would be

2    an entire recalibration of the model, which is a brand

3    new model.  The possibility and the speculation of the

4    future looking is also something that Suffolk County

5    Water Authority does not use the model for, so that

6    would again require recalibration of the model.

7              THE COURT:  Well, you're talking about

8    Suffolk County and I'm not certain -- I want to look at

9    what the parties had to say about -- there's very

10   little on this issue at all so I'm not sure which

11   plaintiffs we're even focusing on other than Suffolk

12   County.  Are we talking just about Suffolk County?

13             MS. BIEHL:  Your Honor, the other plaintiffs

14   that have distribution models are approximately the

15   same, except for the fact that their third-party

16   engineers are the ones who maintain the models.

17             THE COURT:  So all the other plaintiffs have

18   third-party engineers and they have the same kinds of

19   distribution models?

20             MS. BIEHL:  The vast majority do.  I do not

21   believe all plaintiffs have distribution models,

22   meaning that H2M for instance may have a client that

23   does not have a distribution model built by H2M or used

24   by H2M I should say.  I think that's a small number but

25   not all plaintiffs have distribution models based on

1    the information we have today.

2            THE COURT:  Again, the parties are really

3    talking at cross-purposes to one another because I

4    don't even think there's an understanding of what these

5    models are, what they can capture.  If they do not

6    capture what the defendants are seeking, then it would

7    seem that that's the end of the matter.  But I really

8    think that there has to be a further discussion between

9    counsel and between those who are familiar with this

10   data.

11           And in particular, if there's licensed

12   software, what would be involved -- if the defendants

13   determine that this information, they do want it, and

14   if the plaintiffs are not going to agree to produce it,

15   assuming that the defendants bear the costs, then you

16   need to work out the logistics of how that information

17   would be provided to defendants and they would have to

18   pay for it.

19           MR. BLANCHET:  That's sensible to me, your

20   Honor.  I can say with some confidence that for these

21   distribution models, the defendants would pay for

22   whatever software would be needed to run them if their

23   consultants don't already have it.

24           THE COURT:  All right.  The next topic is

25   investigatory documents.  I want to cut through the

1    issue about sources and what's a source.  As I

2    understand it, the plaintiffs' claim that they have

3    produced all documents that reflect investigations of

4    potential sources, whether intermediary sources or

5    ultimate sources, direct sources, but they have

6    produced all documents that reflect investigations

7    concerning dioxane.

8              Is that an accurate statement of the

9    plaintiffs' position in this case?

10             MS. BIEHL:  Yes, your Honor, subject to the

11   ongoing privilege review and supplemental collections,

12   we have produced all documents that we understand the

13   defendants want, "investigatory documents."  Those

14   categories are listed in the letter and I will not

15   repeat them unless your Honor wants me to.

16             THE COURT:  And the defendants, they

17   complain that -- one moment.  They complain that

18   plaintiffs have produced few reports in which they're

19   discharging their regulatory obligations.  As I

20   understand the plaintiffs' position, they're not being

21   asked to produce all reports that they have an

22   obligation to create but only those that are responsive

23   to the relevant demand, which concerns potential

24   sources of dioxane.

25             Is that accurate summary of the plaintiffs'

1    position, Ms. Biehl?

2            MS. BIEHL:  I believe almost, your Honor,

3    which is that, obviously, we disagree with the

4    defendants' mischaracterization of the regulations.

5    But we have produced documents that show investigation

6    sources, potential sources, capture zones, you name it,

7    for all of the wells if the plaintiffs' have it,

8    regardless of if it is dioxane.  We did originally

9    object on that ground because this is a dioxane case

10   after all, but the well radius reports are specific to

11   a well and not a specific contaminant, for instance.

12           THE COURT:  All right.  Mr. Blanchet?

13           MR. BLANCHET:  Yeah.  This is very simple.

14   The problem here is the caveat in their letter, subject

15   to privilege review and ongoing privilege review and

16   supplemental collections.  Our concern is, all of this

17   material was supposed to be produced on March 31st.  We

18   have a deadline for identifying third parties.  Our

19   concern is that given the paucity of the investigative

20   reports that have been produced, it's surprising to us,

21   and the concern is we're going to find out later that

22   there's a whole bunch of other documents that the

23   plaintiffs are going to characterize as part of their

24   supplemental collections.

25           We received four million documents right

1   before the deadline.  Plaintiffs have indicated that --

2   there are 27 plaintiffs and we're in Covid, and they're

3   having some struggles getting documents.  What does

4   supplemental collections mean and what's going to be in

5   those documents?

6           THE COURT:  Ms. Biehl?

7           MS. BIEHL:  Sure, your Honor.  A couple of

8   corrections:  We produced close to one million

9   documents in this case, over 5.5 million pages,

10  approximately.  All of the documents -- excuse me.  All

11  of the information that the defendants are looking for

12  in these investigatory documents has long since been

13  produced.  The supplemental period in which we are

14  collecting is roughly the past year of Covid for most

15  of the clients for which we could not for instance

16  enhance our email collections.  The email collections

17  and productions that have been produced to date span

18  over 20 years for the plaintiffs.  The dates of the

19  documents that have been produced span 90 years.

20          Mr. Blanchet is concocting a concern that is

21  just not one.  Supplemental collections are typical of

22  every case and every massive case where documents

23  continue to be created that are relevant as the

24  litigation goes on.  Privilege review is ongoing.  The

25  defendants have known about that for months.  They've

1    known what substantial completion means for us, and the

2    surprise is surprising to us.  All that said, the

3    supplemental and the privilege production, we have no

4    reason to believe it will be but a fraction of what has

5    been produced to date.

6            If there are ways that the defendants want

7    to talk about prioritization of certain plaintiffs and

8    certain types of documents, we have offered that to the

9    defendants repeatedly and we have not received a

10   response in terms of privilege review and supplemental

11   collections, and we on our own are prioritizing based

12   on responsiveness and in light of the party depositions

13   to start in December, ways to streamline what we think

14   are the biggest, most responsive categories of what's

15   "stuck in the privilege cue."

16            THE COURT:  Let me just clarify because

17   March 31st, it was not the date to complete party

18   document discovery, it was substantial completion.  But

19   that now was nearly two months ago and I understand you

20   have -- there will be a supplemental production for

21   more recent documents.  Are you still undertaking a

22   privilege review of documents that were produced to

23   plaintiffs' counsel before the March 31st substantial

24   completion deadline?

25            MS. BIEHL:  Yes, your Honor.

```
 1              THE COURT:  And I understand that you have

 2    an issue with the defendants' production and I'll put

 3    them on notice as well, but that issue is not currently

 4    before me.  But we can't just have this drag out and

 5    drag on indefinitely and then in the middle of the

 6    summer, the Court is going to be presented with

 7    privilege disputes that I'm expected to resolve in

 8    August so you can start your depositions in September.

 9    That is not an acceptable way to proceed.

10              So how much time do you need to complete

11    your privilege review and the review of the

12    supplemental collection?

13              MS. BIEHL:  Your Honor, the answer is we're

14    going as fast as we can with as much resources as we

15    have right now.  I will say that we don't even have a

16    privilege log protocol in this case.  This is a request

17    the plaintiffs have made of the defendants numerous

18    times and we only just got a conferral on calendar for

19    next week, and I believe some of these issues and ways

20    to streamline the privilege review can be discussed

21    then with the defendants and would be worth the

22    parties' time.

23              I would imagine a couple of months to

24    complete the supplemental collection and review.  We

25    have to go out to Long Island or some of us have to
```

1   trek across the water to Long Island to collect some of

2   those for plaintiffs that do not allow remote

3   collections or do not have the technical capability to

4   do remote collections.  But like I said, the volume of

5   documents that will be produced in those supplemental

6   collections is small compared to what we've already

7   produced to date of close to a million documents.

8           We certainly can guarantee that we will be

9   done with the privilege review and supplemental

10  collection review by the time fact discovery cutoff for

11  a particular case comes up, for instance Suffolk County

12  Water Authority, and certainly by the time the

13  plaintiffs' depositions commence in September is our

14  current goal for those who do no have a fact discovery

15  cutoff.

16          THE COURT:  Well, again, as I said, I don't

17  think that's an adequate response because if you're

18  saying that you will produce your privilege log at the

19  end of August and depositions are starting in

20  September, and perhaps there are going to be disputes

21  over what's included and whether or not depositions

22  should be stayed while those issues are being presented

23  to the Court.  This is not my only case.  I'm not here

24  on retainer.  I literally have hundreds of cases.  So

25  it's not sufficient to say it will be done before the

1    depositions start.

2            It also isn't sufficient to say that you'll

3    produce the results of the supplemental collection in

4    the next couple of months, that this will be much

5    smaller than the prior production.  Much smaller could

6    be 2,000 documents.  So what are we talking about in

7    terms -- what is your reasonable expectation of the

8    number of documents that we're talking about?

9            MS. BIEHL:  For review and supplemental

10   collection, my estimate here today, your Honor, across

11   all of the plaintiffs that I represent is a few hundred

12   thousand documents for review, not production.  Again,

13   the search terms in this case were incredibly broad so

14   it requires us to review a lot more documents than are

15   actually responsive.  So I don't know how many we'll

16   end up producing but it will certainly be an incredibly

17   small percentage of what we produce today.

18           THE COURT:  Well, I think one of the other

19   issues that should be addressed next week when you talk

20   about -- when you have your meet and confer on coming

21   up with a privilege log protocol is coming up with

22   interim deadlines for productions both by plaintiffs

23   and defendants so that we're not in a situation where

24   we have these last-minute productions and disputes that

25   are presented to the Court.

1          MS. BIEHL:  Yes, your Honor.

2          THE COURT:  So with respect to the

3    investigatory documents, I don't know that there's

4    anything else to say other than that the defendants

5    have indicated that they may want to take a deposition

6    of a document custodian to verify that an adequate

7    search was conducted.  The defendants are free to do

8    that but there are deposition limits in place in terms

9    of the number of depositions, and any such depositions

10   will count towards the deposition limit.

11          MR. BLANCHET:  Okay, your Honor.  It's Mr.

12   Blanchet and I didn't mean to interrupt but just for

13   clarity, I think our request was based on the

14   representation from plaintiffs that they had made a

15   full production.  It sounds like there's an

16   acknowledgment that a full production has not been made

17   and we're go to work together to figure out how to get

18   that done in an orderly and hopefully efficient manner.

19          The concern we have now is, we had the order

20   and the rest of the schedule in the case was built off

21   of -- the Court put in her order, built on the premise

22   that the deadlines for production would stick.

23   Obviously, everything gets backed up, and we certainly

24   don't want to be in a position where we're having

25   document dumps right before depositions and having

1    fights about that.

2            THE COURT:  I agree with you but the

3    plaintiffs are complaining that they haven't gotten the

4    documents they've demanded.  I don't want to spend a

5    lot of time on that but if that is the case, then you

6    know what they say about people in glass houses.

7            MR. BLANCHET:  I appreciate that.  I'm happy

8    to give them -- talk to them about that.  It's not

9    something that they've raised with us at any time

10   recently, there's no motion, so I don't want that to

11   become a diversion.  There's a concession here that

12   they haven't produced the documents.  There's not a

13   clear indication of the volume or importance of those

14   documents, and we have a deadline in less than two

15   months to name third parties.  That's the concern that

16   I have immediately.

17           MS. BIEHL:  Your Honor, this is Stephanie

18   Biehl.  I just want to correct the record here.  The

19   documents have been substantially completed since the

20   deadline, which is March 31st.  The investigatory

21   documents at issue in the defendants' motion, which Mr.

22   Blanchet himself says probably would have benefitted

23   from further conferral, have long sing been produced.

24   Those are things that the defendants claim they need to

25   identify potential third-party defendants.  They've had

1   that since November of 2019.

2           What I'm saying about the privilege review

3   with respect to investigatory documents is that it's

4   possible that there are some documents that are caught

5   in a privilege review that the defendants might deem a

6   "investigatory document" and tons and tons and tons of

7   other information that convey who the potential users

8   are of the defendants' product, the source water

9   assessment reports, the capture zone reports, the EDR

10  radius reports, those have all been long since

11  produced.

12          MR. BLANCHET:  Your Honor, if I may, this is

13  the problem.  It's volume over substance.  What I heard

14  plaintiffs' counsel say is that they still need to make

15  a trek across the river to go in and make collections

16  of documents.  So this is not a case where we have the

17  documents, it's a small group, and we need to do a

18  privilege review.  In some cases, the collections

19  haven't been done yet.  They're not in a position to

20  make representations about what may or may not exist.

21  They haven't even done the collection yet.

22          MS. BIEHL:  That's not true, your Honor, if

23  you would like to hear from me.

24          THE COURT:  I really -- I really don't want

25  to hear any more on this.  I think these are

1   conversations that should have taken place among

2   counsel before this.  As I understand it, these are

3   supplemental productions that we're talking about.  And

4   while it may be a fraction of the million documents

5   that have been produced, there's still a substantial

6   number but my understanding is that these are the more

7   recent documents.  But I'd like to move on because we

8   have other issues to address.

9          The next item on the motion to compel

10  documents is what the defendants characterize as well

11  files.  The defendants complain that plaintiffs have

12  produced very few well permit applications and

13  supporting engineer reports.  The plaintiffs claim that

14  they have produced well completion reports for each

15  plaintiff and will produce all permit applications that

16  are kept electronically.

17         Let me first ask, Ms. Biehl, how far back

18  are the permit applications that are kept

19  electronically?

20         MS. BIEHL:  It depends on the plaintiff,

21  your Honor, but we've already produced some that date

22  back to 1933 that have been digitized, so the scope is

23  1933 to the latest well drill, which could have been

24  2019, 2020, 2021.

25         THE COURT:  And why are you now saying that

1  you will produce these?  Why haven't they been

2  produced?

3          MS. BIEHL:  Because this is an area where we

4  share your concern, your Honor.  If the defendants had

5  just called us and told us they meant water supply

6  applications when they said well files, we would have

7  produced them.  Most of them we believe we have

8  produced already, and we've already started to identify

9  where digitized.  They may have not been produced for

10 certain wells for certain plaintiffs.  That's the

11 reason, your Honor.  We didn't hear about this until

12 the motion was filed.

13         MR. BLANCHET:  Your Honor, if I may?

14         THE COURT:  Mr. Blanchet.

15         MR. BLANCHET:  There's no confusion about

16 this.  They produced some of the files, they haven't

17 produced all the files.  It's likely because of the

18 resourcing issue and I wish they would just be candid

19 about that so that we can make wise decisions about

20 scheduling and prioritizing, but we get answers that

21 aren't clear.  They have additional well files that

22 they still need to produce.  I don't know what the

23 status of them are.  They say that they're collecting

24 them and that they will produce them.  We don't know

25 when.

1           We know there are hundreds of wells in play

2      that they haven't produced those documents for, and we

3      need them produced and we need to know when they're

4      going to be produced so we don't have fights about this

5      throughout the summer.  If they need more time, then we

6      should discuss that and adjust the schedule

7      accordingly.  But this hiding the ball and saying one

8      thing about, we've produced some or they have

9      everything they need, it's not getting us anywhere.  We

10     just need specific answers, when are the files going to

11     be all collected and produced.

12           THE COURT:  Have you sought them from the

13     regulators?

14           MR. BLANCHET:  I believe they're part of the

15     subpoena, yeah, but it's unclear that (ui) everything

16     that the plaintiffs have.

17           THE COURT:  Have you gotten a response from

18     the regulators?

19           MR. BLANCHET:  Yes.

20           THE COURT:  All right, that is not an excuse

21     for non-production by the plaintiffs but I wanted to

22     know because I did hear Mr. Blanchet's comment of,

23     well, we'll just adjust the schedule if they're not

24     going to produce it.  That was a schedule that was

25     worked out with Judge Gershon.  It is not a schedule

 1   that I am about to adjust in any way.

 2             MR. BLANCHET:  Understood, your Honor.

 3             THE COURT:  So if what's going on here -- I

 4   know that the defendants were extremely unhappy with

 5   the schedule that was set.  It was substantially

 6   shorter than the five-year period that the defendants

 7   were seeking.  I'm not going to allow this quibbling

 8   over discovery disputes to be used as a wedge to try

 9   and push the schedule back.

10             So here's another area for counsel to

11   discuss next week.  You're really going to have your

12   work cut out for you.  We are going to keep to the

13   deadlines and if I have to set additional deadlines for

14   parties to make supplemental productions, then I will

15   do that before I will simply adjourn deadlines that

16   were set at the direction of the district court.

17             MR. BLANCHET:  Thank you, your Honor.

18             THE COURT:  All right.  The next issue

19   concerns emails.  The defendants are complaining that

20   the plaintiffs have not made a complete email

21   production.  They note that there are several

22   individuals identified in their fact sheet as likely to

23   have relevant information.  Their emails have not been

24   produced.  They also complain about date gaps and

25   emails that third parties have produced that plaintiffs

1    have not.

2           In response, the plaintiffs note that some

3    of the custodians identified by the defendants are

4    nonparties, so that would explain why the plaintiffs

5    haven't produced their emails.  They also represent

6    that they're still producing emails, which again goes

7    back to this issue of, we've got to get these documents

8    from each of the parties into the hands of opposing

9    counsel.  The defendants want to be able to take

10   depositions of custodians of records.  Again, you're

11   free to do that.  That will count towards the number of

12   depositions.

13          Mr. Blanchet, what do you -- what is it that

14   has not been addressed?

15          MR. BLANCHET:  I think it's just a matter of

16   determining when we're going to get the documents.  We

17   see this statement, production will continue pursuant

18   to the Federal Rules, and our concern is that we're

19   going to get late productions or productions right

20   before depositions, and we want to avoid that.  We want

21   to sort that out now and get clarity on what's been

22   produced so that we can have comfort going into these

23   depositions that we're not going to have more fights

24   later.

25          THE COURT:  And I want that assurance as

1    well.  And if it's a matter of resources, the

2    plaintiffs have brought very broad claims in multiple

3    cases and if it's a question of resources, you need to

4    put more resources on these cases because you wanted a

5    short discovery time frame.  I shouldn't say short

6    because we're still talking about 2022 but you got the

7    schedule that you were looking for, for the most part.

8    Now you're going to have to live with it, even if it

9    means putting many more people on the case or the

10   cases.

11          All right, let's turn to the interrogatories

12   now, and if I could just -- I understand that it will

13   be -- who is going to be -- Mr. Martin, you'll be

14   speaking on behalf of the plaintiffs with respect to

15   the interrogatories?

16          MR. MARTIN:  That's correct, your Honor.

17          THE COURT:  And remind me who on behalf of

18   the defendants will be addressing these issues?

19          MR. BLANCHET:  You'll still have me, your

20   Honor, Mr. Blanchet.

21          THE COURT:  All right.  The first issue that

22   -- the motion to compel interrogatories concerns two

23   interrogatories, 1A and 1B, that together asked the

24   plaintiffs to identify each source that you know,

25   that's A, or suspect, that's B, to have contributed to

1    the 14 dioxane each supply well.  One of the

2    preliminary issues that has come up in connection with

3    this dispute is that the defendants claim that the

4    plaintiffs still have not identified all the wells at

5    issue.

6            In response, the plaintiffs counter that

7    they have not been asked.  There was not a discovery

8    demand asking them to identify all the wells at issue.

9    I understand that some of the materials that have been

10   produced list wells that differ in number and identity

11   from report to report.  The plaintiffs have indicated

12   that they will provide a list of the SCWA wells "with

13   detections."

14           So one thing I would like to clarify is, are

15   the differing numbers the result of the fact that the

16   sampling results vary over time so that there may be

17   contamination -- dioxane contamination in a well on a

18   particular date and perhaps a year later, it's not

19   shown but maybe the year after that, there is

20   contamination again.  Is that what accounts for the

21   varying numbers and lists that have been produced?  Mr.

22   Martin?

23           MR. MARTIN:  Your Honor, it's Scott Martin.

24   I can fully understand how your Honor might infer that.

25   There seems to be an implication in the defendants'

1   letter that somehow, surreptitiously and inexplicably,

2   we dropped 78 wells from the case.  No, that's not the

3   distinction here.  The question is which wells are

4   contaminated and which wells are at issue for damages.

5   Mr. Blanchet and I get along famously well, probably to

6   the consternation mutually of our colleagues.  If he

7   had picked up the phone and said, Scott, can you

8   clarify this for me, I would have.

9            347 wells were identified as contaminated.

10  Only 269 of those were at issue for damages, however,

11  and that's because the authority is not seeking damages

12  for monitoring wells.  Those are the small-diameter

13  wells that are drilled for testing and monitoring of

14  the aquifer and they are not one to pump drinking water

15  to Long Islanders.  So they're contaminated but they

16  don't count for damages, obviously.  That's the

17  distinction.  It's that simple.  There's no complicated

18  Venn diagrams over time here.

19            THE COURT:  Well, it does seem like a

20  straightforward response and I'm surprised that you say

21  you and Mr. Blanchet get along so well because this

22  really should have been an issue that you resolved by

23  talking to each other.  Even if he didn't pick up the

24  phone, you could have told him that.  You could have

25  said that in your response to the various discovery

1   dispute letters between counsel, in your letter to the

2   Court.  This is the first time I'm hearing it.  I

3   presume it's the first time Mr. Blanchet is hearing it.

4         MR. BLANCHET:  That's correct, your Honor.

5   From our perspective, this is a very simple issue.  We

6   need to know the wells that are contaminated, the wells

7   that are at issue, and then either yes or no for each

8   of those wells.  And if it's yes, what is the source.

9   And if it's, we don't know, just say that.  It's that

10   simple.

11         If you go through them, you can see there

12   are varying degrees of responsiveness.  I will

13   compliment -- at the risk of getting shunned at

14   cocktail parties, I will compliment New York Water

15   Authority.  They made a good-faith effort to respond to

16   the interrogatory, they supplemented it, and now it

17   really does help focus discovery.  That's the type of

18   response we simply want from each of the plaintiffs.

19         THE COURT:  Well, as I understand it, the

20   defendants are seeking information that's kept in the

21   ordinary course of business.  As I read the plaintiffs'

22   response, this is not information they have in the

23   ordinary course of business.  This is either work

24   product information that's been developed in

25   anticipation of litigation and it is going to be the

```
1   subject of expert discovery.  So what is your response
2   to that?
3            MR. BLANCHET:  Two different issues, your
4   Honor.  We are not seeking their expert work.  We are
5   seeking what they -- each plaintiff in the normal
6   course of business knows or suspects about each well
7   contaminated with dioxane.  If they don't know the
8   source of the contamination, all they have to do is
9   identify the well and say, we don't know.  If they do
10  know or suspect in the ordinary course of business,
11  just identify the source.  That's it for each well.
12  That's all we'd like.  Again, New York Water Authority
13  did it in a manner that's very helpful and I think
14  narrows the issues and focuses discovery and will make
15  discovery of those claims go much more smoothly.  And I
16  suspect that each plaintiff can do the same.  They just
17  haven't yet.
18            THE COURT:  Well, the plaintiffs have cited
19  documents that have been produced.  They've said that
20  under Rule 33, they've satisfied their obligation.  If
21  they were to represent to the Court that all relevant,
22  non-privileged information has been produced regarding
23  the knowledge or suspicion regarding the sources and
24  cites of contamination, is that sufficient?
25            MR. BLANCHET:  No, your Honor, and I'll tell
```

1    you why.

2              THE COURT:  Why not?

3              MR. BLANCHET:  Because the documents that

4    they cite -- and I've looked at them.  The documents

5    that they cite pertain to some wells, and it's not as

6    if the documents say, we suspect that contamination in

7    this well came from this site.  They're relevant to

8    that determination but they don't address that.

9              The bigger issue is -- and we gave them

10   credit for this in our appendix laying out -- it's only

11   a very small number of wells that are in play.  But

12   what would do the trick is for the other wells that are

13   in play, if they identify those and then just tell us

14   they don't have any information about the source of the

15   contaminant in the well.  That would suffice if that's

16   the answer, but what we're getting now is make-wait

17   objections and ambiguous kind of responses that are

18   all-encompassing.

19             THE COURT:  Well, I'm not even going to

20   address the make-wait objections.  I'm trying to get to

21   the heart of the issue here.  And when you say there

22   are only a small number of wells that are in play, what

23   do you mean by that?  Maybe there's something in an

24   appendix that I missed.

25             MR. BLANCHET:  In appendix A to our

1   interrogatory motion, we tried to lay this out in great

2   detail, and I can walk the Court through a couple of

3   examples of exactly what we're talking about.

4            THE COURT:  All right, appendix A, which my

5   recollection is, is extremely long.

6            MR. BLANCHET:  I think it's --

7            THE COURT:  No, I take it back.  It's 7

8   pages.

9            MR. BLANCHET:  7 pages.  And what we do here

10  in the column to the far left is each plaintiff, the

11  number of wells that they identified in their fact

12  sheets, and then excerpted the substantive part of

13  their interrogatory response.  They all start with the

14  boiler plate kind of language and objections but some

15  of them provided some substance.

16           So for example, Albertson.  They're a

17  plaintiff.  They claim damages related to five wells.

18  We asked them what they know about the sources, either

19  known or suspected, and all we got was a generic,

20  boiler-plate response.  For Suffolk County, which is

21  the lead plaintiff, they have identified 347 wells.

22  Mr. Martin and I can work out how that breaks out, but

23  the larger point is, they identify 14 documents.

24           The 14 documents are commercially available

25  property reports that simply identify superfund and

1    environmental sites in the vicinity of specific wells.

2    So the 14 documents and the narrative response cover 17

3    of their wells that they've put at issue, and that's

4    fine.  It's good that we have that information.  The

5    problem is, and the devil is in the details, is that we

6    have to defend against the remaining 330 and we don't

7    know what their position is on that.  If they don't

8    know, just tell us what the wells and say you don't

9    know.  That's it.

10          As an example, if the Court looks at New

11   York American Water, if I can find it here.  Yep, New

12   York American Water, where there's 25 wells at issue.

13   They did specific responses for the wells that they

14   know about.  Now, we would prefer it -- I suspect that

15   they won't have a problem giving this to us but just

16   confirm for us that the other wells, the wells that you

17   haven't identified, you don't know what the source is

18   and you don't, in the normal course of business, come

19   to a conclusion or have done an analysis about what you

20   suspect the source of the contaminant in the well is.

21          It's really important to the third-party

22   issue because for some of these well, the plaintiffs

23   will say, we know that the contamination -- the dioxane

24   in this well came from this specific, known superfund

25   site.  Then the defendants as a group, we can decide

1   whether that party that was responsible for historical

2   contamination and is responsible for cleaning that up

3   should or shouldn't be brought into the case.

4           The other issue is that for some of these

5   third parties, there's already consent decrees or

6   contracts that exist and I think we attach one to our

7   exhibits, where the party has already agreed with some

8   of the water districts that they're responsible for the

9   contaminants and that they will clean it up, either at

10  the well head or at their facility.  The relevance of

11  that goes without saying, but it's something that we

12  spoke to the Court about in December of 2019, I

13  believe, and it's not a lot of work.  It should be a

14  straightforward yes or no and if yes, just identify the

15  site.

16          THE COURT:  Mr. Martin?

17          MR. MARTIN:  Your Honor, this is precisely

18  the sort of information that is appropriate for a Rule

19  33(d) response, which is what we provided.  Suffolk

20  County Water Authority is not in the business of (ui)

21  local car washes, et cetera.  The information that we

22  have is in the defendants' hands.  When we certified

23  that to the Court on April 19th, we did not do that

24  lightly.

25          You have for example, and Ms. Biehl has

1    already address it, these EDR radius map reports,

2    environmental data resources.  Those identify the

3    coordinates of a particular well, particular users,

4    TCA, suspected intermediate sources of dioxane in that

5    corresponding area, et cetera.  All of it, the entirety

6    of it has been provided to the defendants.

7              We will provide them a list of the wells.

8    It's very simple and, frankly, the first indication

9    that I had was when I saw the motion to compel, that

10   there was miscommunication there or misunderstanding on

11   the part of the defendants, but we'll provide them a

12   list of the wells that are at issue.  In fact, it has

13   just been updated.  Not surprisingly, there are 9

14   additional wells, so rather than 269 it is 278.  The

15   plumes move, and we will continue to update that as we

16   approach trial.

17             THE COURT:  Well -- I apologize for using

18   that word in this case.  What is your position with

19   respect to whether you're -- apart from privileged

20   information or apart from testimony and opinions that

21   will come from an expert, if your client were asked to

22   answer questions on a well-by-well basis, would your

23   client be able to answer that question?

24             MR. MARTIN:  I think the client would answer

25   the question on the basis of the information that has

been provided to the defendants, the documents that
have been provided to the defendants.  That would be
the non-privileged, non-expert response that the client
currently has.

THE COURT:  Mr. Blanchet said that only a
small number -- that the documents relate only to a
small number of the wells.  So are you saying that your
client has no non-privileged information responsive to
those interrogatories with respect to the remaining
wells?

MR. MARTIN:  As to those wells, where for
example there are not SWAP reports, there are not EDR
radius map reports, et cetera, that have been provided,
then, your Honor, that would be correct.  There is not
non-privileged information that the client has.  With
respect to the documents themselves and Mr. Blanchet's
characterization of it as applying only to a small
portion of the wells, I would defer to my colleague Ms.
Biehl on that, but were have produced what we have.

THE COURT:  And the Court for the most part
has not been provided with the documents, the Bates
documents produced in discovery.  They haven't been
attachments, with one or two exceptions, haven't been
produced to the Court, so I don't know what those look
like.  But do they by their terms relate to specific

1    wells?

2                MR. MARTIN:  They do --

3                MS. BIEHL:  Your Honor --

4                Sorry, Scott, I was just going to go ahead

5    and take your invitation to explain the documents.  I

6    also want to start by saying I'm happy to submit some

7    of these for in camera review.  They haven't been filed

8    publicly because they have critical infrastructure

9    information, which is precise well locations

10   specifically.

11               One example of what these documents look

12   like is, for instance, a diagram of the well, a

13   description of how the well is built, the capture zone

14   of the well, including maps, various maps that are

15   attached to source water assessment reports that show

16   exactly where the capture zone is and when potential

17   land use is in the vicinity, what potential businesses

18   are in the vicinity, whether or not they relate to the

19   defendants' products.  Those exist and have been

20   produced for every well regardless of the dioxane

21   contamination wells.

22               Mr. Martin, take it away if I screwed any of

23   that up, please.

24               MR. MARTIN:  That's fine.

25               THE COURT:  I don't know if that answers the

1    Court's question regarding, does one looking at -- the

2    question is, if one looks at the documents that have

3    been produced, to the extent that they identify other

4    potential sources or immediate sources, dischargers of

5    dioxane, do those relate to a specific well?  Can one

6    determine that from it, and are plaintiffs representing

7    that those are the -- that's the sole non-privileged

8    information that Suffolk County Water Authority has

9    with respect to the information that's being sought in

10   interrogatories 1A and 1B?

11            MR. MARTIN:  Your Honor, it's Scott Martin

12   again.  I'm looking at one such document right now and

13   we did not want to burden you with the documents.  We

14   could submit them for in camera review, of course.  In

15   answer to --

16            THE COURT:  But I want to know -- yeah, I

17   want an answer to my question.  I'm not looking for a

18   further production.

19            MR. MARTIN:  No, and I assumed as much.  In

20   direct answer to your question, it specifically

21   identifies the wells with its coordinates and within

22   that radius map, a list of potential users of dioxane,

23   one of which I can say -- one of which is a distributor

24   and one of which is another we believe to be a customer

25   of the defendants.  So the answer to your question,

1  your Honor, is yes.

2          THE COURT:  Let me ask, if the interrogatory

3  was -- let's assume we're talking now about Suffolk

4  County in particular.  Identify each source that you

5  know or suspect to have contributed to the 14 dioxane

6  in your water supply system.  So if the question was

7  not teed to specific wells, is the information

8  concerning sources -- is the information that appears

9  in Exhibit A, the summary of plaintiffs' interrogatory

10 responses entitled "non-generic portion of response to

11 interrogatory 1B," is that the complete universe?

12         MR. MARTIN:  Well, I'm looking at it right

13 now and I'm seeing ellipses on mine and I don't think

14 that's a quirk.  But the answer is yes, your Honor,

15 we've produced -- what we have produced with respect to

16 specific wells at issue I believe would constitute what

17 would be produced with respect to the aquifer in the

18 aggregate in terms of our knowledge.  But I'll ask Ms.

19 Biehl to confirm that's correct.

20         MS. BIEHL:  That's correct.  The documents

21 that have been produced are all-inclusive, period.

22         THE COURT:  So the narrative portion --

23 putting aside for the moment the Bates numbers, the

24 narrative portion is a complete listing of sources

25 known by Suffolk County Water Authority or suspected by

1   the plaintiffs to have contributed to the

2   contamination.

3            MS. BIEHL:  Your Honor --

4            MR. MARTIN:  The --

5            MS. BIEHL:  Go ahead, Scott.

6            MR. MARTIN:  Go right ahead, Stephanie.

7            MS. BIEHL:  Your Honor, the narrative

8   portion is complete, meaning describing that defendants

9   are the source of the dioxane.  The list of Bates

10  numbers is likely not complete because these were

11  served in July and several more documents have been

12  produced.  I don't know how many we'd need to add but

13  these EDR reports are thousands of pages long usually,

14  and all of those Bates numbers probably are not listed

15  in full for every plaintiff, but it is certainly

16  representative of what the plaintiffs know or suspect

17  to be the potential point sources of the defendants'

18  products.

19            THE COURT:  That's what I'm getting at.

20  Putting aside whether or not the listing that appears

21  before me of the Bates numbers is complete, are there

22  other point sources that are known or suspected that

23  have not been disclosed to defendants?

24            MR. MARTIN:  Your Honor, the answer to that

25  is no, and there are numerous point sources if you will

1    or intermediate sources, to use Judge Gershon's term,

2    that are identified in those documents by name.

3              THE COURT:  Who is speaking now?

4              MR. MARTIN:  That was Mr. Martin, your

5    Honor.

6              MR. BLANCHET:  Your Honor, it's Mr.

7    Blanchet.  If I may because I've shared that this

8    conversation has kind of gotten off course to the

9    information that we're looking for.  The sources in the

10   water supply system are not something that helps us

11   understand the claims or narrow the cases.  These cases

12   are well-specific and the contamination in each well

13   comes from different sources.  All we want to know is,

14   for each well where there's dioxane in it, did the

15   plaintiff in the normal course of business know or not

16   know or suspect or not suspect where the source of the

17   contamination in each of the 600-plus wells at issue

18   came from.  If the answer is no, just tell us no.

19   But the compilation of documents that just list

20   potential sources of contamination -- I mean, yes,

21   those need to be produced, but the purpose of this

22   interrogatory was to narrow the issue.  What sources go

23   to what wells?  If you don't know, just tell us you

24   don't know.

25              THE COURT:  What I'm trying to get at is

whether or not all non-privileged documents have been

produced and what is going to be the source of the

knowledge of potential point sources?  Presumably, it's

going to be the documents.  So what you're asking for

is, you're asking the plaintiffs to go through all the

documents and then tie the point sources to specific

wells.  If you have the documents, then you're capable

of doing that to the extent that that information is in

the documents.  I understand that your defense is going

to be based on a well-specific approach.  I gather the

plaintiffs are not in a position to provide information

beyond what's in the documents.

MR. BLANCHET:  If that's the case, they

should just say that.  That's it.  There might be

sources of documents that they don't have possession

of.  There are a lot of EPA documents, a lot of DEC

documents that do in-depth investigations.  There are

well permitting documents, things of that nature, where

when they detect dioxane in a well, they may or may not

draw conclusions about, we know where the source of

that dioxane comes from.  And if they didn't draw those

conclusions, say you didn't draw those conclusions.

Identify for us what well you've concluded goes with

what point source.  In some cases, they did that.  New

York American Water identifies those.  That's all we're

1   looking for.  And if the answer is, we don't know, we

2   would just like a verified response that says that.

3          MR. WINER:  Your Honor, if I may just

4   briefly for a moment.

5          THE COURT:  Is that Mr. Martin?

6          MR. WINER:  No, this is Jed Winer on behalf

7   of Proctor & Gamble.

8          THE COURT:  All right.

9          MR. WINER:  I found this to be -- we're

10  obviously only in three of the cases but one of the

11  cases that we're in that I think this issue is

12  particular acute for is the Hicksville Water District

13  case, which we referenced in a footnote in our letter.

14  They have specifically sued previously over the same

15  wells and the same dioxane, naming different

16  defendants, and in each case alleged that they are the

17  full and direct sources of the dioxane in the wells.

18         So there is clearly some inconsistencies to

19  say the least, and when we served an interrogatory on

20  Hicksville, nothing in response, no documents that are

21  referenced, no identification of sources.  We have to

22  assume that if Hicksville sued 50 defendants in another

23  case (ui) in the Eastern District, that they had a

24  basis for pursuing those defendants for being the

25  source of the contamination.  In fact, one of the

1    wells, 4-2, they actually sued a defendant years ago

2    and settled with the defendant over that contamination.

3    So this is now the third time they're suing over well

4    4-2 for the same contamination.  I just wanted to flag

5    that because that's one of the three cases we're in

6    where the response was particular deficient.  Thank

7    you, your Honor.

8              THE COURT:  Ms. Factor, why don't you

9    respond since that's directed specifically at your

10   client.

11             MS. FACTOR:  Sure, your Honor.  The

12   defendants have asked for and we have agreed to

13   produce, as have all the other plaintiffs, to produce

14   relevant and non-privileged documents.  Just like these

15   other plaintiffs, we are undergoing additional

16   privilege review and it is true that my client has and

17   is currently actually suing some defendants that it

18   considers may be sources.  That information for the

19   most part is attorney work product subject to expert

20   opinion and privilege.  So while we are still, you

21   know, undergoing that review, the mast majority of that

22   documentation is privileged.  That would be the reason

23   that we haven't produced it, as we have explained in

24   our correspondence.

25             THE COURT:  Well, I don't see your client as

1   standing on the same footing as some of the other

2   plaintiffs.  If you've already sued other defendants,

3   then presumably, there is non-privileged information

4   relating to those other defendants who are being sued,

5   and there's no indication that you pointed to that in

6   responding to this interrogatory.

7          MS. FACTOR:  Well, your Honor, we have

8   produced -- just like the other plaintiffs, we have

9   produced reports and SWAP reports, and all the same

10  information as all the other plaintiffs, which

11  generally show the sources for each well and the

12  suspected sources.  But specifically with respect to

13  possible defendants, subject to -- you're right.  In

14  the ordinary course of business, to the extent that

15  there's maybe a report from a public agency, yes, we

16  would produce that.  But if there was information

17  collected for purposes of the litigation, we would

18  argue that that would be covered by work product and

19  privilege.

20         THE COURT:  I'm just getting a lot of

21  double-talk now and my patience is wearing very thin.

22  To the extent that the plaintiffs have produced and

23  identified all responsive, non-privileged documents,

24  the Court is not inclined to require the plaintiffs to

25  go through well by well and try to make the

1   correlation, if it's going to be based on the same

2   documents that have been produced to the defendants.

3   But I'm really not satisfied that all the documents

4   have been produced, that all the plaintiffs have

5   provided sufficient responses and identifications of

6   documents, and we really need to move this case along.

7           So I think this is going to have to be the

8   subject of further discussions among counsel, and if

9   you can't resolve it, then you'll have to come back

10  again and come back quickly.  So as I said, I want a

11  status report a week from today but I really want the

12  parties to seriously dig into these issues and make

13  progress, and either tell me that you've resolved them

14  or that you expect to resolve them within another week,

15  or if they haven't been resolved, then they're going to

16  have to be teed up for resolution, and I will then

17  issue specific orders but based on a more complete

18  record and my understanding of what has been provided

19  and what's available for production.

20          MR. BLANCHET:  Thank you, your Honor.

21          THE COURT:  We really need to move these

22  cases along and not have the parties playing hide the

23  ball.  I am not going to require make work on the part

24  of plaintiffs so that they have to go through, as I

25  said before, well by well and start figuring out, all

1   right, we've given them a list of 20 other point

2   sources or intermediate sources and now let's figure

3   out which well each one relates to.  But it may well be

4   that the plaintiffs ought to be up front about they

5   know and what they don't know because otherwise, they

6   may have to sit for depositions and be asked these

7   questions.

8            Is there anything else that we need to

9   address today?

10           MR. BLANCHET:  No, your Honor.  Thank you

11  for your time.

12           MR. MARTIN:  No, thank you, your Honor.

13           THE COURT:  All right.  We did have a number

14  of attorneys who were mostly going to be deferring to

15  Ms. Biehl and -- well, we had lead counsel -- is there

16  anyone else who wants to be heard who hasn't been?

17           MR. DILLARD:  Your Honor, this is Mr.

18  Dillard on behalf of the defendant Vulcan.  I just had

19  a question.  If I understand Mr. Martin a few moments

20  ago, he mentioned that there are nine additional wells

21  that will now be in the case because, as he says, the

22  plume or plumes have moved.  That was for Suffolk

23  County.

24           THE COURT:  He said there are 270 wells now

25  that are at issue because the plumes have moved.

1            MR. DILLARD:  Okay.  So my question would
2    be --
3            THE COURT:  You want to know which 8 ones,
4    which 8 wells?
5            MR. DILLARD:  We certainly need to know
6    that.  We have 56 days from today by my count to join
7    third parties in 27 cases, so you can I'm sure
8    appreciate the urgency that we feel about this issue.
9            THE COURT:  Mr. Martin, why don't you
10   identify those newly-added wells, even if there hasn't
11   been a formal interrogatory?  Why don't you provide it
12   so that we're not back here arguing over it.
13           MR. MARTIN:  Your Honor, we absolutely will
14   provide that and we will provide the full list of the
15   278, and I expect to do that (ui) tomorrow.
16           THE COURT:  Very good.
17           MR. DILLARD:  Thank you.
18           THE COURT:  Anything else?
19           MR. DILLARD:  Just a comment, your Honor.
20   That's for Suffolk County and of course, we have the
21   same request for all of the other 26 plaintiffs, if
22   there are going to be any additional wells.
23           THE COURT:  All right, those are less time
24   sensitive but the defendants are entitled to that
25   information.

1          MR. DILLARD:  Your Honor, respectfully,

2     they're not less time sensitive with respect to the

3     third-party joinder deadline of July 16, as I

4     understand it.

5          THE COURT:  All right, point taken.

6          MS. BIEHL:  Your Honor --

7          THE COURT:  Who was just speaking, just so

8     the record is clear.

9          MR. DILLARD:  That was Mr. Dillard on behalf

10    of Vulcan, your Honor.

11         THE COURT:  All right.  Someone else wanted

12    to be heard?

13         MS. BIEHL:  Yes, your Honor, this is

14    Stephanie Biehl.  I was just going to speak on behalf

15    of the remaining plaintiffs that the Sher Edling firm

16    represents.  We will identify a list of wells for those

17    plaintiffs as soon as we can and we will start doing

18    that next week.

19         THE COURT:  Is there any reason why you

20    can't start doing that this week, tomorrow?

21         MS. BIEHL:  We can start doing it today.  I

22    meant start the production next week.  We certainly

23    have already started doing that.

24         THE COURT:  All right.  Anything else?

25         MR. DILLARD:  Your Honor, Mr. Dillard again.

1   Might I inquire about New York American Water and

2   Hicksville, the same question?

3              THE COURT:  You can inquire about it but

4   don't inquire of me, inquire of plaintiffs' counsel

5   after this proceeding has concluded.

6              All right, I'm going to conclude this

7   proceeding.  I'll expect to see your joint status

8   report by next Thursday, the 27th.  I'm going to

9   conclude the proceeding.  Everyone please take care and

10  stay safe.  Goodbye.

11                        * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON               May 24, 2021